**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

1. **MONICAH OKOBA OPATI, in her own right,
   As Executrix of the ESTATE OF CAROLINE
   SETLA OPTI, Deceased**

   **and**

2. **SELIFAH ONGECHA OPATI**

   **and**

3. **RAEL ANGARA OPATI**

   **and**

4. **JOHNSTONE MUKABI, an Employee
   of the United States Government
   or an Employee of a contractor for
   the United States Government**

   **and**

5. **SALOME RATEMO, in his own right,
   As Executor of the ESTATE OF SALLY
   CECILIA MAMBOLEO, Deceased**

   **and**

6. **KEVIN RATEMO**

   **and**

7. **FREDRICK RATEMO**

   **and**

8. **LOUIS RATEMO**

   **and**

9. **STACY WAITHERA, as the daughter of
   PERRIS KAMAU, deceased, in the rights
   of her mother, PERRIS KAMAU, as daughter**

**and lawful heir of JOEL GITUMBI KAMAU**

**and**

10. **MICHAEL DANIEL WERE, as the son of WELLINGTON M. OLUOMA**

   **and**

11. **JUDITH NANDI BUSERA, Spouse of LIVINGSTONE BUSERA MADAHANA, an Employee of the United States Government or an Employee of a contractor for the United States Government**

   **and**

12. **ROSELYNE KARSORANI, an Employee of the United States Government or an Employee of a contractor for the United States Government**

   **and**

13. **GEORGE MWANGI, son of CHARLES MWANGI NDIBUI, an Employee of the United States Government or an Employee of a contractor for the United States Government**

   **and**

14. **BERNARD MACHARI, an Employee of the United States Government or an Employee of a contractor for the United States Government**

   **and**

15. **GAD GIDEON ACHOLA, an Employee of the United States Government or an Employee of a contractor for the United States Government**

**and**

16. **MARY NJOKI MUIRURI, an Employee**
    **of the United States Government**
    **or an Employee of a contractor for**
    **the United States Government**

    **and**

17. **JONATHAN KARANIA NDUTI, Spouse of**
    **MARY NJOKI MUIRURI**

    **and**

18. **GITIONGA MWANIKI, Spouse of**
    **MARY WANJURU GITONGA, an Employee**
    **of the United States Government**
    **or an Employee of a contractor for**
    **the United States Government**

    **and**

19. **ROSE NYETTE, an Employee**
    **of the United States Government**
    **or an Employee of a contractor for**
    **the United States Government**

    **and**

20. **ELIZABETH NZAKU, an Employee**
    **of the United States Government**
    **or an Employee of a contractor for**
    **the United States Government**

    **and**

21. **PATRICK NYETTE, an Employee**
    **of the United States Government**
    **or an Employee of a contractor for**
    **the United States Government**

    **and**

22. **CORNEL KEBUNGO, an Employee**
    **of the United States Government**

**or an Employee of a contractor for
the United States Government**

**and**

**23. PHOEBE KEBUNGO, Spouse of
CORNEL KEBUNGO**

**and**

**24. JOAN ADUNDO, an Employee
of the United States Government
or an Employee of a contractor for
the United States Government**

**and**

**25. BENARD ADUNDO, Spouse of Joan Adundo**

**and**

**26. NANCY NJOKI MACHARIA, an Employee
of the United States Government
or an Employee of a contractor for
the United States Government and/or
the Spouse of STANLEY KINYUA MACHARIA,
an Employee of the United States Government
or an Employee of a contractor for
the United States Government**

**and**

**27. SALLY OMONDI, an Employee
of the United States Government
or an Employee of a contractor for
the United States Government**

**and**

**28. JAEL NYOSIEKO OYOO, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

**and**

29. **EDWIN OYOO, Spouse of**
    **JAEL NYOSIEKO OYOO**

    **and**

30. **MIRIAM MUTHONI, an Employee**
    **of the United States Government**
    **or an Employee of a Contractor for**
    **the United States Government**

    **and**

31. **PRISCAH OWINO, an Employee**
    **of the United States Government**
    **or an Employee of a contractor for**
    **the United States Government**

    **and**

32. **GREG OWINO, Spouse of**
    **PRISCAH OWINO**

    **and**

33. **MICHAEL KAMAU MWANGI, an Employee**
    **of the United States Government**
    **or an Employee of a Contractor for**
    **the United States Government**

    **and**

34. **JOSHUA O. MAYUNZU, an Employee**
    **of the United States Government**
    **or an Employee of a Contractor for**
    **the United States Government**

    **and**

35. **ZACKARIA MUSALIA ATING'A, an Employee**
    **of the United States Government**
    **or an Employee of a Contractor for**
    **the United States Government**

    **and**

36. **JULIUS M. NYAMWENO, an Employee**

**of the United States Government
or an Employee of a Contractor for
the United States Government**

    **and**

37. **POLYCHEP ODHIAMBO, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

    **and**

38. **DAVID JAIRUS AURA, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

    **and**

39. **CHARLES OLOKA OPONDO, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

    **and**

40. **ANN KANYAHA SALAMBA, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

    **and**

41. **ERASTUS MIJUKA NDEDA, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

    **and**

42. **TECHONIA OLOO OWITI, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

**and**

43. **JOSEPH INGOSI, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

    **and**

44. **WILLIAM W. MAINA, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

    **and**

45. **PETER NGIGI MUGO, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

    **and**

46. **SIMON MWANHI NHURE, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

    **and**

47. **JOSEPH K. GATHUNGU, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

    **and**

48. **DIXON OLUBINZO INDIYA, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

    **and**

49. **PETER NJENGA KUNGU, an Employee
of the United States Government**

**or an Employee of a Contractor for**
**the United States Government**

**and**

50. **CHARLES GT. KABUI, an Employee**
**of the United States Government**
**or an Employee of a Contractor for**
**the United States Government**

**and**

51. **JOHN KISWILLI, an Employee**
**of the United States Government**
**or an Employee of a Contractor for**
**the United States Government**

**and**

52. **FRANSISCA KYALO, an Employee**
**of the United States Government**
**or an Employee of a Contractor for**
**the United States Government**

**and**

53. **CHARITY KITAO, as the daughter of**
**ELIZABETH VICTORIA KITAO**

**and**

54. **LEILANI BOWER, daughter of**
**GERALD W. BOCHART,**
**a United States citizen and an Employee**
**of the United States Government**
**or an Employee of a contractor for**
**the United States Government**

**and**

55. **WINNIE NDIODA KIMEU, a Minor, daughter of**
**KIMEU NZIOKA NGANGA, deceased,**
**by and through her Mother and Next Friend,**
**MARY MUTHEU NDAMBUKI**

**and**

**56. MICHAEL NGANGA KIMEU, son of KIMEU NZIOKA NGANGA, deceased**

   **and**

**57. AUDREY MAINI NASIEKU PUSSY, daughter of RACHEL MUNGASIA PUSSY, deceased**

   **and**

**58. KENNEDY OKELO, brother of LUCY GRACE ONONO, deceased**

   **and**

**59. HELLEN OKELO NYAIEGO, sister of LUCY GRACE ONONO, deceased**

   **and**

**60. RONALD OKELO, brother of LUCY GRACE ONONO, deceased**

   **and**

**61. ELIZABETH M. AKINYI OKELO, sister of LUCY GRACE ONONO, deceased**

   **and**

**62. LESLEY HELLEN ACHIENG, daughter of LUCY GRACE ONONO, deceased**

   **and**

**63. RISPAH JESSICA AUMA, daughter of LUCY GRACE ONONO, deceased**

   **and**

**64. STEPHEN JONATHAN OMANDI, son of LUCY GRACE ONONO, deceased**

   **and**

65. **ANDREW THOMAS OBONGO, son of
    LUCY GRACE ONONO, deceased**

    **and**

66. **LAURA MARGARET ATIENO, daughter of
    LUCY GRACE ONONO, deceased**

    **and**

67. **WALLACE NJOREGE STANLEY NYOIKE,
    brother of VINCENT KAMAU NYOIKE**

    **and**

68. **PETER KINYANJUI NGUGI, brother of
    PETER KABAU MACHARIA**

    **and**

69. **LUKAS NDILE KIMEU, a Minor, son of
    KIMEU NZIOKA NGANGA, deceased,
    by and through his Mother and Next Friend,
    MARY MUTHEU NDAMBUKI**

    **and**

70. **JACKSON KTHUVA MUSKOYA, son of
    DOMINIC MUSYOKA KITHUVA, deceased**

    **and**

71. **GLADYS MUNANIE MUSYOKA, daughter of
    DOMINIC MUSYOKA KITHUVA, deceased**

    **and**

72. **MARCY MUSYOKA KITHUVA, daughter of
    DOMINIC MUSYOKA KITHUVA, deceased**

    **and**

73. **JANE MUTUA, daughter of
    DOMINIC MUSYOKA KITHUVA, deceased**

    **and**

**74. MARY NZISIVA SAMUEL, daughter of**
**DOMINIC MUSYOKA KITHUVA, deceased**

   **and**

**75. SYUINDO MUSYOKA, daughter of**
**DOMINIC MUSYOKA KITHUVA, deceased**

   **and**

**76. KILEI MUSYOKA, daughter of**
**DOMINIC MUSYOKA KITHUVA, deceased**

   **and**

**77. CONCEPTOR ORENDE, sister of**
**ERIC ABUR ONYANGO, deceased**

   **and**

**78. GRACE BOSIBERI ONSONGO, sister of**
**EVANS ONSONGO, deceased**

   **and**

**79. NEPHAT KIMATHI, a Minor, son of**
**FRANCIS MBOGO NJUNG'E, deceased,**
**by and through his Mother, SARAH**
**MWENDIA MBOGO**

   **and**

**80. LEONARD SHINENGAH, an Employee**
**of the United States Government**
**or an Employee of a Contractor for**
**the United States Government**

   **and**

**81.  CAROLINE WANGU KARIGI, as the daughter of**
**LUCY KARIGI, deceased**

   **and**

82. **STEVE MARUNGI KARIGI, as the son of
LUCY KARIGI, deceased**

    **and**

83. **MARTIN KARIGI, as the son of
LUCY KARIGI, deceased**

    **and**

84. **WYCLIFFE OKELLO KHABUCHI, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

    **and**

85. **MARY SALIKU BULIMU, the Spouse of
HESBON BULIMU, an Employee of
the United States Government
or an Employee of a Contractor for the
United States Government**

    **and**

86. **HESBON LIHANDA, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

    **and**

87. **WINIFRED MAINA, the Spouse of
FRANCIS MAINA NDIBUI, an Employee
of the United States Government
or an Employee of a Contractor for the
United States Government**

  **and**

88. **BETTY KAGAI, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government and/or
the Mother of ELSIE KAGIMBI, an
Employee of the United States Government**

**or an Employee of a Contractor for the
United States Government**

 **and**

**89. KATIMBA MOHAMED, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government**

   **and**

**90. FRIDA YOHAN MTITU, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government and/or
the Spouse of GEOFFREY L. TUPPER, an
Employee of the United States Government
or an Employee of a Contractor for the
United States Government**

   **and**

**91. GEOFFREY L. TUPPER, an Employee
of the United States Government
or an Employee of a Contractor for
the United States Government and/or
the Spouse of FRIDA YOHAN MTITU, an
Employee of the United States Government
or an Employee of a Contractor for the
United States Government**

   **and**

**92. OMAR ZUBERI OMAR, brother of
ABDALLAH MOHAMED MNYOLYA, deceased**

   **and**

**93. ASHA R. MAHUNDI, daughter of
RAMADHANI H. MAHUNDI, deceased**

   **and**

**94. EMMA R. MAHUNDI, daughter of
RAMADHANI H. MAHUNDI, deceased**

**and**

95. **MWAJUMA R. MAHUNDI, daughter of RAMADHANI H. MAHUNDI, deceased**

    **and**

96. **SHABAN R. MAHUNDI, son of RAMADHANI H. MAHUNDI, deceased**

    **and**

97. **JUMA R. MAHUNDI, son of RAMADHANI H. MAHUNDI, deceased**

    **and**

98. **AMIRI R. MAHUNDI, son of RAMADHANI H. MAHUNDI, deceased**

    **and**

99. **YUSUPH R. MAHUNDI, son of RAMADHANI H. MAHUNDI, deceased**

    **and**

100. **MWAJABU R. MAHUNDI, daughter of RAMADHANI H. MAHUNDI, deceased**

    **and**

101. **ALLY R. MAHUNDI, son of RAMADHANI H. MAHUNDI, deceased**

    **and**

102. **SAID R. MAHUNDI, son of RAMADHANI H. MAHUNDI, deceased**

    **and**

103. **ASHA SHABANI KILUWA, spouse of RAMADHANI H. MAHUNDI, deceased**

**Plaintiffs**

**v.**

**REPUBLIC OF SUDAN**
**Ministry of External Affairs**
**People's Palace**
**Khartoum, Sudan**

**and**

**MINISTRY OF THE INTERIOR**
**OF THE REPUBLIC OF THE SUDAN**
**People's Palace**
**Khartoum, Sudan**

**and**

**THE ISLAMIC REPUBLIC OF IRAN**
**Ministry of Foreign Affairs**
**Khomeini Avenue**
**United Nations Street**
**Tehran, Iran**

**and**

**THE IRANIAN MINISTRY**
**OF INFORMATION AND SECURITY**
**Pasdaran Avenue**
**Golestan Yekom**
**Tehran, Iran**

## <u>COMPLAINT</u>

Plaintiffs, MONICAH OKOBA OPATI, et al., file this lawsuit pursuant to the Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605A, and related statutes.  The lawsuit is brought to recover for their damages suffered as a result of the Sudanese and Iranian sponsored terrorist attacks upon the Embassies of the United States located in Dar es Salaam, Tanzania and Nairobi, Kenya on August 7, 1998.

The scope of potential plaintiffs in a lawsuit brought under 28 U.S.C. § 1605A, the amended state sponsor of terrorism exception to foreign sovereign immunity, includes non-US nationals if the "claimant or victim was at the time" of the terrorist bombing an "employee of the Government of the United States . . ." or were "an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment . . . ."  28 U.S.C. § 1605A(a)(2)(A)(ii).

1.      Jurisdiction in this Court arises pursuant to 28 U.S.C. §§ 1605A, 1330(a), 1331 and 1332(a)(2).

2.      The Plaintiffs in this case are some U.S. nationals and numerous non-U.S. nationals who were an "employee of the Government of the United States . . ." or were "an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment . . . ." at the time of the bombings.

3.      Subject matter jurisdiction is properly asserted under 28 U.S.C. § 1605A.  The Foreign Sovereign immunities Act provides that there "shall" be personal jurisdiction over a foreign state whenever there is subject matter jurisdiction over a claim for relief plus effective service of process.  28 U.S.C. § 1330(b).

4.      While acting within the scope of their employment or office, agents, employees and officials of the Islamic Republic of Iran ("Iran") provided the technical know-how and tactical training that allowed Al Qaeda to build the bombs that destroyed the embassies.  This qualifies as material support as it is defined under 28 U.S.C. § 1605A.

5.      While acting within the scope of their employment or office, agents, employees and officials of the Republic of Sudan ("Sudan") provided a broad range of critical support to Al Qaeda over a number of years without which Al Qaeda would have never been able to relocate

from Afghanistan to Africa or grow into an organization capable of performing the attacks on the embassies.  This qualifies as material support as it is defined under 28 U.S.C. § 1605A.

6.      The provision of material support by Iran and the Sudan meets the requirements for subject matter jurisdiction established by 28 U.S.C. § 1605A as to the US national and non-national plaintiffs.  28 U.S.C. § 1605A allows non-US nationals, if the claimant or the victim was an "employee of the Government of the United States . . .", or were "an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment . . . ."  28 U.S.C. § 1605A(a)(2)(A)(ii), to bring suit against the state-sponsors of terrorism who caused their personal injury or death.  All non-US nationals were either an employee of the Government of the United States or an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment or a family member thereof.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4). This action is timely filed pursuant to § 1083(c)(3) of the National Defense Authorization Act for Fiscal Year 2008, which states:

> (c) Application to Pending Cases-
> . . .
> (3) RELATED ACTIONS- If an *action arising out of an act or incident has been timely commenced under section 1605(a)(7)* of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208), *any other action arising out of the same act or incident may be brought* under section 1605A of title 28, United States Code, if the action is commenced not later than the latter of 60 days after--
> (A) the date of the entry of judgment in the original action; or
> (B) the date of the enactment of this Act.
> .

Pub. L. No. 110-181, § 1083(c)(3), 122 Stat. 3, 338-344.  *Owens v. Republic of Sudan*, CA 01-2244 (JDB) (D.D.C. filed October 26, 2001) is action on behalf of victims of the 1998 Embassy

bombings in Kenya and Tanzania filed under 28 U.S.C. § 1605(a)(7), in which a judgment has not been filed.  This action qualifies as "*any other action arising out of the same act or incident* [which] *may be brought* under section 1605A of title 28, United States Code".

8.      The causes of action contained in the eight counts later enumerated herein in this Complaint are based upon the following sources of law:

a.      a new federal private right of action 28 U.S.C. § 1605A(c), which is available both to US national and non-US national Plaintiffs;

b.      the common or statutory law of a Plaintiff's residence wherever it contains rights or makes further damages available that are not duplicative of the recovery afforded under 28 U.S.C. § 1605A(c) as Plaintiffs have causes of action under the common or statutory law of the US state or foreign country where they were domiciled at the time of the attack.

c.      for the non-US nationals Plaintiffs, who do not possess a cause of action under  28 U.S.C. § 1605A, the common and statutory laws of their domicile state or the District of Columbia or Kenya or Tanzania for wrongful death, solatium, loss of consortium, assault and battery, intentional infliction of emotional distress and survival, whether statutory or common law.


## PARTIES

**A.      Nairobi, Kenya, Embassy Bombing Plaintiffs:**

1.      Plaintiff, MONICAH OKOBA OPATI, is a citizen of Kenya and is the daughter of the late CAROLINE SETLA OPTI, who was employed by the U.S. Government or an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya.   Plaintiff brings this action in her

own right, in her capacity as Executrix and as a beneficiary of the Wrongful Death, Survival and other claims pled in this Complaint, and on behalf of her siblings, RAEL ANGARA OPATI and SELIFAH ONGECHA OPATI.

2.      Plaintiff, JOHNSTONE MUKABI, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was employed by the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

3.      Plaintiff, SALOME RATEMO, is a citizen of Kenya and is the son of the late SALLY CECILIA MAMBOLEO, who was employed by the U.S. Government or an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya.   Plaintiff brings this action in his own right, in his capacity as Executor and as a beneficiary of the Wrongful Death, Survival and other claims pled in this Complaint, and on behalf of his siblings, KEVIN RATEMO, FREDRICK RATEMO, and LOUIS RATEMO.

4.      Plaintiff, STACY WAITHERA, is a citizen of Kenya and is the daughter of PERRIS KAMAU, who was the daughter of JOEL GITUMBI KAMAU, who was employed by the U.S. Government or an employee of a contractor for the U.S. Government, and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya.  Plaintiff brings this action in her own right, in her capacity as Executrix and as a beneficiary of the Wrongful Death, Survival and other claims pled in this Complaint, and on behalf of her mother, PERRIS KAMAU, deceased.

5.      Plaintiff, MICHAEL DANIEL WERE, is a citizen of Kenya and is the son of the late WELLINGTON M. OLUOMA, who was employed by the U.S. Government or an employee

of a contractor for the U.S. Government and was injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya.   Plaintiff brings this action in his own right for his loss of society and severe emotional distress, and on his father's behalf in his capacity as Executor of the Estate of WELLINGTON M. OLUOMA, deceased, for claims pled in this Complaint.

6.      Plaintiff, JUDITH NANDI BUSERA, is a citizen of Kenya and is the spouse of LIVINGSTONE BUSERA MADAHANA, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

7.      Plaintiff, ROSELYNE KARSORANI, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was employed by the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in her own right.

8.      Plaintiff, GEORGE MWANGI, is a citizen of Kenya and is the son of CHARLES MWANGI NDIBUI, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

9.      Plaintiff, BERNARD MACHARI, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was employed by the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his own right.

10.      Plaintiff, GAD GIDEON ACHOLA, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was employed by the U.S. Government or an employee of a

contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

11.     Plaintiff, MARY NJOKI MUIRURI, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was employed by the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in her own right.

12.     Plaintiff, JONATHAN KARANI NDUTI, a citizen of Kenya and the spouse of MARY NIOKI MUIRURI, was employed by the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

13.     Plaintiff, GITIONGA MWANIKI, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was employed by the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

14.     Plaintiff, ROSE NYETTE, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was employed by the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in her own right.

15.     Plaintiff, ELIZABETH NZAKU, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was employed by the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in her own right.

16.     Plaintiff, PATRICK NYETTE injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was employed by the U.S. Government or an employee of a

contractor for the U.S. Government and is a citizen of Kenya who brings this action in his own right.

17.     Plaintiff, CORNEL KEBUNGO, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was employed by the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

18.     Plaintiff, PHOEBE KEBUNGO, a citizen of Kenya and the spouse of CORNEL KEBUNGO, who was employed by the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

19.     Plaintiff, JOAN ADUNDO, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was employed by the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

20.     Plaintiff, BENARD ADUNDO, a citizen of Kenya and the spouse of JOAN ADUNDO, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his/her loss of society and severe emotional distress.

21.     Plaintiff, NANCY NJOKI MACHARIA, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was employed by the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.  Plaintiff is also the spouse of STANLEY KINYUA MACHARIA, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his/her loss of society and severe emotional distress.

22.     Plaintiff, SALLY OMONDI, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was employed by the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

23.     Plaintiff, JAEL NYOSIEKO OYOO, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was employed by the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

24.     Plaintiff, EDWIN OYOO, a citizen of Kenya and the spouse of JAEL NYOSIEKO OYOO, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his/her loss of society and severe emotional distress.

25.     Plaintiff, MIRIAM MUTHONI, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

26.     Plaintiff, PRISCAH OWINO, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

27.     Plaintiff, GREG OWINO, is a citizen of Kenya and is spouse of PRISCAH OWINO, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and brings this action for his/her loss of society and severe emotional distress.

28.     Plaintiff, MICHAEL KAMAU MWANGI, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

29.     Plaintiff, JOSHUA O. MAYUNZU, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

30.     Plaintiff, ZACKARIA MUSALIA ATING'A, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

31.     Plaintiff, JULIUS M. NYAMWENO, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

32.     Plaintiff, POLYCHEP ODHIAMBO, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

33.     Plaintiff, DAVID JAIRUS AUARA, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a

contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

34.     Plaintiff, CHARLES OLOKA OPONDO, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

35.     Plaintiff, ANN KANYAHA SALAMBA, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

36.     Plaintiff, ERASTUS MIJUKA NDEDA, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

37.     Plaintiff, TECHONIA OLOO OWITI, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

38.     Plaintiff, JOSEPH INGOSI, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

39.     Plaintiff, WILLIAM W. MAINA, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a

contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

40.     Plaintiff, PETER NGIGI MUGO, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

41.     Plaintiff, SIMON MWANHI NHURE, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

42.     Plaintiff, JOSEPH K. GATHUNGU, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

43.     Plaintiff, DIXON OLUBINZO INDIYA, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

44.     Plaintiff, PETER NJENGA KUNGU, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

45.     Plaintiff, CHARLES GT. KABUI, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

46.     Plaintiff, JOHN KISWILLI, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

47.     Plaintiff, FRANSISCA KYALO, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

48.     Plaintiff, CHARITY KITAO, a citizen of Kenya and the daughter of ELIZABETH VICTORIA KITAO, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

49.     Plaintiff, LEILANI BOWER, a citizen of Kenya and the daughter of GERALD W. BOCHART, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

50.     Plaintiff, PETER KINYANJUI NGUGI, is a citizen of Kenya and is the brother of PETER KABAU MACHARIA, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

51. Plaintiff, WALLACE NJOREGE STANLEY NYOIKE, is a citizen of Kenya and is the brother of VINCENT KAMAU NYOIKE, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

52. Plaintiff, LAURA MARGARET ATIENO, is a citizen of Kenya and is the daughter of LUCY GRACE ONONO, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

53. Plaintiff, ANDREW THOMAS OBONGO, is a citizen of Kenya and is the son of LUCY GRACE ONONO, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

54. Plaintiff, STEPHEN JONATHAN OMANDI, is a citizen of Kenya and is the son of LUCY GRACE ONONO, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

55. Plaintiff, RISPAH JESSICA AUMA, is a citizen of Kenya and is the daughter of LUCY GRACE ONONO, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

56. Plaintiff, LESLEY HELLEN ACHIENG, is a citizen of Kenya and is the daughter of LUCY GRACE ONONO, who was an employee of the U.S. Government or an employee of a

contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

57.     Plaintiff, ELIZABETH M. AKINYI OKELO, is a citizen of Kenya and is the sister of LUCY GRACE ONONO, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

58.     Plaintiff, RONALD OKELO, is a citizen of Kenya and is the, brother of LUCY GRACE ONONO, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

59.     Plaintiff, HELLEN OKELO NYAIEGO, is a citizen of Kenya and is the, sister of LUCY GRACE ONONO, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

60.     Plaintiff, KENNEDY OKELO, is a citizen of Kenya and is the, sister of LUCY GRACE ONONO, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

61.     Plaintiff, AUDREY NAINI NASIEKU PUSSY, is a citizen of Kenya and is the daughter of RACHEL MUNGASIA PUSSY, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

62.     Plaintiff, MICHAEL NGANGA KIMEU, is a citizen of Kenya and is the son of KIMEU NZIOKA NGANGA, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

63.     Plaintiff, WINNIE NDIODA KIMEU, is a citizen of Kenya and is the daughter of KIMEU NZIOKA NGANGA, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

64.     Plaintiff, LUKAS NDILE KIMEU, a minor, is a citizen of Kenya and is the son of KIMEU NZIOKA NGANGA, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress through his mother and next friend, MARY MUTHEU NDAMBUKI.

65.     Plaintiff, JACKSON KITHUVA MUSKOYA, is a citizen of Kenya and is the son of DOMINIC MUSYOKA KITHUVA, deceased, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

66.     Plaintiff, GLADYS MUNANIE MUSYOKA, is a citizen of Kenya and is the daughter of DOMINIC MUSYOKA KITHUVA, deceased, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

67.     Plaintiff, MARCY MUSYOKA KITHUVA, is a citizen of Kenya and is the daughter of DOMINIC MUSYOKA KITHUVA, deceased, who was an employee of the U.S.

Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

68.   Plaintiff, JANE MUTUA, is a citizen of Kenya and is the daughter of DOMINIC MUSYOKA KITHUVA, deceased, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

69.   Plaintiff, MARY NZISIVA SAMUEL, is a citizen of Kenya and is the daughter of DOMINIC MUSYOKA KITHUVA, deceased, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

70.   Plaintiff, SYUINDO MUSYOKA, is a citizen of Kenya and is the daughter of DOMINIC MUSYOKA KITHUVA, deceased, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

71.   Plaintiff, KILEI MUSYOKA, is a citizen of Kenya and is the daughter of DOMINIC MUSYOKA KITHUVA, deceased, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

72.   Plaintiff, CONCEPTOR ORENDE, is a citizen of Kenya and is the sister of ERIC ABUR ONYANGO, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

73.     Plaintiff, GRACE BOSIBERI ONSONGO, is a citizen of Kenya and is the sister of EVANS ONSONGO, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

74.     Plaintiff, NEPHAT KIMATHI, is a citizen of Kenya and is the son of FRANCIS MBOGO NJUNG'E, deceased, who was employed by the U.S. Government or an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya, and brings this action for his loss of society and severe emotional distress.

75.     Plaintiff, LEONARD SHINENGAH, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

76.     Plaintiff, CAROLINE WANGU KARIGI, is a citizen of Kenya and is the daughter of LUCY KARIGI, deceased, who was employed by the U.S. Government or an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya, and brings this action for her loss of society and severe emotional distress.

77.     Plaintiff, STEVE MARUNGI KARIGI, is a citizen of Kenya and is the son of LUCY KARIGI, deceased, who was employed by the U.S. Government or an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya, and brings this action for his loss of society and severe emotional distress.

78.     Plaintiff, MARTIN KARIGI, is a citizen of Kenya and is the son of LUCY KARIGI, deceased, who was employed by the U.S. Government or an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya, and brings this action for his loss of society and severe emotional distress.

79.     Plaintiff, WYCLIFFE OKELLO KHABUCHI, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

80.     Plaintiff, MARY SALIKU BULIMU, is a citizen of Kenya and is the spouse of HESBON BULIMU, deceased, who was employed by the U.S. Government or an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Nairobi, Kenya, and brings this action for her loss of society and severe emotional distress.

81.     Plaintiff, HESBON LIHANDA, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.

82.     Plaintiff, WINIFRED MAINA, is a citizen of Kenya and is the spouse of FRANCIS MAINA NDIBUI, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

83.     Plaintiff, BETTY KAGAI, injured in the terrorist bombing of the U.S. Embassy at Nairobi, Kenya, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Kenya who brings this action in his/her own right.  Plaintiff is also the mother of ELSIE KAGIMBI, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his/her loss of society and severe emotional distress.

**B.     Dar es Salaam, Tanzania, U.S. Embassy bombing Plaintiffs**

84.     Plaintiff, KATIMBA MOHAMED, injured in the terrorist bombing of the U.S. Embassy at Dar es Salaam, Tanzania, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Tanzania who brings this action in his own right.

85.     Plaintiff, FRIDA YOHAN MTITU, injured in the terrorist bombing of the U.S. Embassy at Dar es Salaam, Tanzania, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Tanzania who brings this action in her own right.  Plaintiff is also the spouse of Geoffrey L. Tupper, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for her loss of society and severe emotional distress.

86.     Plaintiff, GEOFFREY L. TUPPER, injured in the terrorist bombing of the U.S. Embassy at Dar es Salaam, Tanzania, was an employee of the U.S. Government or an employee of a contractor for the U.S. Government and is a citizen of Tanzania who brings this action in his own right.  Plaintiff is also the spouse of Frida Yoahn Mtitu, who was an employee of the U.S.

Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

87.     Plaintiff, OMAR ZUBERI OMAR, is a citizen of Tanzania and is the brother of Abdallah Mohamed Mnyolya, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

88.     Plaintiff, ASHA R. MAHUNDI, is a citizen of Tanzania and is the daughter of Ramadhani H. Mahundi, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

89.     Plaintiff, EMMA R. MAHUNDI, is a citizen of Tanzania and is the daughter of Ramadhani H. Mahundi, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

90.     Plaintiff, MWAJUMA R. MAHUNDI, is a citizen of Tanzania and is the daughter of Ramadhani H. Mahundi, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

91.     Plaintiff, SHABAN R. MAHUNDI, is a citizen of Tanzania and is the son of Ramadhani H. Mahundi, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

92.     Plaintiff, JUMA R. MAHUNDI, is a citizen of Tanzania and is the son of Ramadhani H. Mahundi, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

93.     Plaintiff, AMIRI R. MAHUNDI, is a citizen of Tanzania and is the son of Ramadhani H. Mahundi, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

94.     Plaintiff, YUSUPH R. MAHUNDI, is a citizen of Tanzania and is the son of Ramadhani H. Mahundi, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

95.     Plaintiff, MWAJABU R. MAHUNDI, is a citizen of Tanzania and is the daughter of Ramadhani H. Mahundi, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

96.     Plaintiff, ALLY R. MAHUNDI, is a citizen of Tanzania and is the son of Ramadhani H. Mahundi, who was an employee of the U.S. Government or an employee of a contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

97.     Plaintiff, SAID R. MAHUNDI, is a citizen of Tanzania and is the son of Ramadhani H. Mahundi, who was an employee of the U.S. Government or an employee of a

contractor for the U.S. Government, and brings this action for his loss of society and severe emotional distress.

98.     Plaintiff, ASHA SHABANI KILUWA, is the spouse of Ramadhani H. Mahundi, who was employed by the U.S. Government or an employee of a contractor for the U.S. Government and was killed as a result of the August 7, 1998 terrorist attack on the U.S. Embassy at Dar Es Salaam, Tanzania.   Plaintiff brings this action for loss of consortium, loss of society and severe emotional distress.

**B.     Defendants:**

99.     Defendant, the **REPUBLIC OF SUDAN** (hereinafter referred to as "Sudan"), is a foreign state within the meaning of 28 U.S.C. § 1391(f) and 1603(a).

100.     SUDAN has been designated as a foreign state that sponsors terrorism within the meaning of 28 U.S.C. § 1605A and the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. §2371.

101.     SUDAN, through its officials, officers, agents and employees, provided material support and resources to OSAMA BIN LADEN and AL QAEDA. The support provided by SUDAN to OSAMA BIN LADEN and AL QAEDA assisted in or contributed to the preparation and execution of the plans that culminated in the U.S. Embassy bombings at Nairobi, Kenya, and Dar Es Salaam, Tanzania, and the extrajudicial killing and/or injury of the Plaintiffs.

102.     The Defendant, the Ministry of the Interior of the Republic of Sudan, is an agency of Defendant, the Republic of Sudan.  Its activities at the time of this occurrence included the support of terrorist activities directed against foreign targets by terrorist groups operating with cover of the Republic of Sudan.

103.    Defendant, the **ISLAMIC REPUBLIC OF IRAN** (hereinafter referred to as "Iran"), is a foreign state within the meaning of 28 U.S.C. §1391(f) and 1603(a).

104.    Defendant, IRAN, has been designated as a foreign state that sponsors terrorism within the meaning of 28 U.S.C. § 1605A and the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. §2371.

105.    Defendant, IRAN, has been found to be liable as a state sponsor of international terrorism under 28 U.S.C. § 1605(a)(7), especially in connection with acts perpetrated by its state sponsored paramilitary terrorist organization known as "Hezbollah," in various cases before this court, including *Anderson v. the Islamic Republic of Iran,* 90 F. Supp. 2d 107 (D.D.C. 2000), and *Cicippio v. Islamic Republic of Iran,* 18 F. Supp. 2d 62 (D.D.C. 1998).

106.    IRAN, through its officials, officers, agents and employees including the Ministry of Foreign Affairs, the Iranian Ministry of Information and Security, and Iranian Revolutionary Guard Corps, provided material support and resources to OSAMA BIN LADEN and AL QAEDA both directly and through its surrogate, Hezbollah. The support provided by IRAN to OSAMA BIN LADEN and AL QAEDA assisted in or contributed to the preparation and execution of the plans that culminated in the terrorist bombing of the U.S. Embassies at Nairobi, Kenya, and Dar es Salaam, Tanzania, and the deaths and injuries caused by those bombings.

107.    The Defendant, the Iranian Ministry of Information and Security, is a political subdivision and/or agency of Defendant, the Islamic Republic of Iran.  Its activities at the time of this occurrence included the support of terrorist activities directed against foreign targets by terrorist groups operating with cover of the Islamic Republic of Iran.

## FACTS

**A.      The history, organization, and function of Al Qaeda:**

108.   In or about 1989, OSAMA BIN LADEN, MUHAMMAD ATEF, and others founded an international terrorist group that became known as "AL QAEDA" ("the Base"). OSAMA BIN LADEN was the "emir" (prince) of AL QAEDA and was its leader at all relevant times. Members of AL QAEDA pledged an oath of allegiance (called a "bayat") to OSAMA BIN LADEN and AL QAEDA.

109.   From 1989 until about 1991, AL QAEDA was headquartered in AFGHANISTAN and in Peshawar, Pakistan. In or about 1991, the leadership of AL QAEDA, including OSAMA BIN LADEN, relocated to the Sudan. AL QAEDA was headquartered in the Sudan from approximately 1991 until approximately 1996 but also maintained offices in various parts of the world. In 1996, OSAMA BIN LADEN and other members of AL QAEDA relocated to AFGHANISTAN .

110.   OSAMA BIN LADEN and AL QAEDA violently opposed the United States for several reasons. First, the United States was regarded as an "infidel" because it was not governed in a manner consistent with the group's extremist interpretation of Islam. Second, the United States was viewed as providing essential support for other "infidel" governments and institutions, particularly the governments of Saudi Arabia and Egypt, the nation of Israel, and the United Nations organization, which were regarded as enemies of the group. Third, AL QAEDA opposed the involvement of the United States armed forces in the Gulf War in 1991 and in Operation Restore Hope in Somalia in 1992 and 1993. In particular, AL QAEDA opposed the continued presence of American military forces in Saudi Arabia (and elsewhere on the Saudi Arabian peninsula) following the Gulf War. Fourth, AL QAEDA opposed the United States Government because of the arrest, conviction and imprisonment of persons belonging to AL QAEDA or its affiliated terrorist groups or those with whom it worked. For these and other reasons, OSAMA

BIN LADEN declared "*jihad*," or holy war, against the United States, which he had carried out through AL QAEDA and its affiliated organizations.

111.    AL QAEDA functioned both on its own and through some of the terrorist organizations that operated under its umbrella, including: Egyptian Islamic Jihad, which was led by Ayman al-Zawahiri, and at times, the Islamic Group (also known as "el Gamaa Islamia" or simply "Gamaa't"), and a number of jihad groups in other countries, including the Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Philippines, Tajikistan, Azerbaijan, and the Kashmiri region of India and the Chechnyan region of Russia. AL QAEDA also maintained cells and personnel in a number of countries to facilitate its activities, including in Kenya, Tanzania, the United Kingdom, Germany, Canada, Malaysia, and the United States.

112.    AL QAEDA had a command and control structure which included a "*majlis al shura*" (or consultation council) which discussed and approved major undertakings, including terrorist operations.

113.    AL QAEDA had a "military committee" which considered and approved "military" matters.

114.    OSAMA BIN LADEN and AL QAEDA also forged alliances with the National Islamic Front in the Sudan, with representatives of IRAN, and its associated terrorist group Hezbollah, and with representatives of the government of IRAQ for the purpose of working together against their perceived common enemy in the West, the United States.

115.    Since at least 1989, OSAMA BIN LADEN and the terrorist group AL QAEDA sponsored, managed, and/or financially supported training camps in AFGHANISTAN.  Those camps were used to instruct members and associates of AL QAEDA and its affiliated terrorist

groups in the use of firearms, explosives, chemical weapons, and other weapons of mass destruction. In addition to providing training in the use of various weapons, these camps were used to conduct operational planning against United States targets around the world and experiments in the use of chemical and biological weapons. These camps were also used to train others in security and counterintelligence methods, such as the use of codes and passwords, and to teach members and associates of AL QAEDA about traveling to perform operations. For example, AL QAEDA instructed its members and associates to dress in "Western" attire and to use other methods to avoid detection by security officials. The group also taught its members and associates to monitor media reports of its operations to determine the effectiveness of their terrorist activities.

116.    Since on or about 1996, OSAMA BIN LADEN and others operated AL QAEDA from their headquarters in AFGHANISTAN.   During this time, OSAMA BIN LADEN and others forged close relations with the TALIBAN and MUHAMMAD OMAR in AFGHANISTAN .   OSAMA BIN LADEN openly informed other AL QAEDA members and associates outside AFGHANISTAN of their support of, and alliance with, the TALIBAN and MUHAMMAD OMAR.

**B.    The "fatwahs" and the "jihad" terrorist campaign against Americans:**

117.    One of the principal goals of AL QAEDA was to drive the United States armed forces out of Saudi Arabia (and elsewhere on the Saudi Arabian peninsula) and Somalia by violence. These goals eventually evolved into a declaration of *jihad* against America and all Americans. Members of AL QAEDA issued "*fatwahs*" (rulings on Islamic law) indicating that such attacks on Americans were both proper and necessary.

118.   At various times from on or about 1992, OSAMA BIN LADEN, working together with members of the *fatwah* committee of AL QAEDA, disseminated *fatwahs* to other members and associates of AL QAEDA.   These *fatwahs* directed that United States citizens should be attacked and murdered.

119.   On various occasions, OSAMA BIN LADEN and other co-conspirators advised members of AL QAEDA that it was proper to engage in violent actions against "infidels" (nonbelievers), even if others might be killed by such actions, because if the others were "innocent," they would go to paradise, and if they were not "innocent," they deserved to die.

**C.   The sovereign nation defendants furnished critical aid to underwrite the terrorist conspiracy against the United States:**

120.   In furtherance of the conspiracy, the named Defendants and unknown John Doe Defendants committed the following acts:

a.   At various times from at least as early as 1990, Defendants and their unknown co-conspirators provided military and intelligence training in various areas, including AFGHANISTAN, IRAQ, IRAN, Pakistan, and the Sudan, for the use of AL QAEDA and its affiliated groups.

b.   At various times from at least as early as 1989, Defendants and others known and unknown, engaged in financial and business transactions on behalf of AL QAEDA, including, but not limited to: purchasing land for training camps; purchasing warehouses for storage of items, including explosives; purchasing communications and electronics equipment; transferring funds between corporate accounts; and transporting currency and weapons to members of AL QAEDA and its associated terrorist organizations in various countries throughout the world.

c.      In the early 1990s, the government of Sudan sent overtures to Bin Laden and Al Qaeda, inviting the group to relocate en mass from Afghanistan to the Sudan.  Jamal Ahmed Al-Fadl, a top Al Qaeda lieutenant who served Bin Laden in Afghanistan as well as the Sudan, learned of the impending relationship between Al Qaeda and the Sudanese government for the first time at one of the meetings in Peshwar, Pakistan that occurred between the Sudanese government, Bin Laden and other Al Qaeda members.  The representatives of the Sudanese government, promised the support of that government should Al Qaeda come to the Sudan.  Al Qaeda thereafter used Sudanese Airways planes to ferry anti-tank rockets and Stinger missiles from Afghanistan to the Sudan.

d.      The government of the Sudan is run by President Field Marshall Omar Hassan al-Bashir, the head of state of the Sudan, through an alliance of the military and the National Congress Party, formerly the National Islamic Front.

e.      Al-Fadl went to the Sudan to secure residential and commercial property for Al Qaeda.  The purpose of some of the property was to provide a safe place to train Al Qaeda militants.

f.      Essam Al Riddi, a pilot who worked for Bin Laden in 1993, stated that he purchased a plane for Bin Laden; oversaw its refurbishment; and flew it to Khartoum in 1993.

g.      While Al Riddi stayed in Khartoum, he dined with Bin Laden and had several discussions with him.  Bin Laden was staying in a large villa in Khartoum, with an office and a guesthouse.  The Sudanese government provided security for Al Qaeda.  15-20 Sudanese men dressed in Sudanese army fatigues, using jeeps with Sudanese army license plates, were stationed at the villa.

h.      Al Qaeda provided Al Riddi with a plane from the Sudan Airlines to ferry militants to Nairobi.  Bin Laden discussed the possibility of Al Riddi transporting some Stinger missiles from Pakistan to the Sudan.

i.      Bin Laden assured him that the Sudanese and Pakistani intelligence agencies would cooperate with the weapons transfer.

j.      The training that Al Qaeda engaged in the Sudan included explosives training. The loud noises drew the local police after complaints from neighbors and Al Fadl was among those arrested.  He was quickly released, due to the close relationship between Al Qaeda, and the Sudanese intelligence service, a Defendant in this action.  According to Al-Fadl:

> [W]e call the intelligence office because we have relationship with them, and the intelligence office came and they tell the local police we take care of that, and don't worry about that.  And they take us to the jail, and they say you shouldn't do that, we tell you to refresh[1], not to make real explosives.

k.      Al-Fadl saw a letter from President al-Bashir that explained the relationship between Al Qaeda and the Sudanese intelligence.  With the explicit approval of Bin Laden, Al-Fadl also personally worked with the Sudanese intelligence officers.

l.      The Sudanese intelligence officers and government officials, at all times, acted within the scope of their office or agency during the activities described in this Complaint.

m.      The intelligence officers were organized into a "delegation office" to meet the needs of the Al Qaeda group in the Sudan.  There was an explicit fear that agents from foreign governments or informants would disclose Al Qaeda's location and activities in the Sudan. Some of these informants were consequently jailed in the Sudan.  Al-Fadl would identify

---

[1] "Refresh" meant refresher courses for the militants who had already received training in the past.

suspicious foreigners to the Sudanese intelligence as Al Qaeda sought to keep its presence and activities in the Sudan secret.

n.      The delegation office, staffed with Sudanese intelligence officers, also helped provide security for Al Qaeda and facilitated the movement of weapons in and out of the country.  On one particular trip, the weapons were taken out of the country by delivering four crates of weapons to a hangar at a Sudanese military base, and then to a port facility owned by the Sudanese army.

o.      The letter from President al-Bashir was absolutely essential to the operations of the Al Qaeda terrorist group, which was secretly training in the Sudan.  The letter allowed Al Qaeda members, such as Al Fadl, to bypass tax and customs collection on international shipments and guaranteed their shipments, coming or going, would not be inspected.

p.      Weapons and explosive shipments moved through a quay protected by the Sudanese military in Port Sudan into a barracks used by Sudanese armored and mechanized infantry.  The letter would allow shipments from overseas to bypass inspection at a port and then travel back to Khartoum without inspection by the local police at the numerous checkpoints along the way.

q.      The delegation office, the Sudanese government's go-between with Al Qaeda, also protected Al Qaeda members, such as Al-Fadl, from the interference of Sudanese immigrations office at the airport.  This was important because if Al Qaeda members were caught abroad and their passports were stamped with Sudanese immigration markings, it would be clear to foreign agents where the organization was located.

r.      Al Qaeda also set up a number of companies that provided it with critical income so that it could continue its growth and evolution into a lethal organization with global reach.

However, Al Qaeda did not come to Sudan to operate as a regular capitalist enterprise. Rather, the purpose of the investment in Sudanese business activity was as an adjunct to its mission of aggression against the West, as explicitly stated by Bin Laden himself:

. . . [O]ur agenda is bigger than business. We not going to make business here, but we need to help the government and the government help our   group, and this our purpose.

s.      Among the Sudanese companies founded by Al Qaeda were: Laden International Company for import and export; Taba Investment for currency exchange; Hijra Construction Company, which built the largest road existing in Sudan; and the Al Themar al Mubaraka, which ran the farm where Al Qaeda trained its militants in explosives. The Hijra Construction Company purchased explosives for its road and bridge building activities.

t.      Al Qaeda also had extensive holdings in Khartoum, including business offices, guesthouses, farms and residential houses. Bin Laden even had a bank account in Khartoum in his true name. Al Qaeda purchased some of the companies directly from the Sudanese government. The funding that these companies provided to Al Qaeda was critical to its survival and continued existence. At a meeting, which included Bin Laden, the fluctuation of Sudanese currency caused great concern as most of Al Qaeda's income was derived from this business activity.

u.      Al Qaeda's position regarding the United States was clear, as early as, in 1992 when Bin Laden issued a fatwa against the United States due to its presence in the Gulf region during the First Gulf War and its actions in Somalia. The discussion surrounding the fatwa included an explicit allowance for the murder of innocent civilians. Al Qaeda provided support to groups in Somalia, Yemen, the Philippines, Tajikistan, and Pakistan, among others.

v.      The partnership forged with the Sudanese government derived benefits for both parties, as do all successful partnerships.  The Sudanese government employed Al Qaeda to manufacture chemical weapons in a section of Khartoum, called Hilat Koko, for use against the rebels in southern Sudan.  Al-Fadl traveled to the chemical weapons manufacturing area with a Sudanese military officer, who explained the need for chemical weapons by the Sudanese government.

w.      Al Qaeda also provided communications equipment and Kalishnikov rifles for the Sudanese army, founded by the Islamic National Front, to fight the Christian rebels in the south. Al-Fadl, as part of this arrangement, also worked directly for the Sudanese government.  For example, a Sudanese intelligence officer who also worked in the immigration office, approached Al-Fadl and asked him to spy on a government opposition leader.  Al-Fadl arrested the opposition leader and tried to turn him away from his work against the Sudanese government. The Sudanese intelligence officer advised Al-Fadl to lie to the opposition leader, to tell him that Al-Fadl had quit Al Qaeda and had stopped working with the government.  Al-Fadl reported back to the head of the delegation office, the group of Sudanese intelligence officers that protected Al Qaeda; facilitated communications with the Sudanese government; and provided logistical support.

x.      Dr. Abdullah Mohamed Yusef, a member of the Islamic National Front, through which President al-Bashir ran the Sudanese government, organized travel, documents and funneled economic aid to Al Qaeda while it was located in the Sudan.

y.      Al Qaeda entered into a transaction to purchase uranium through the former President of the Sudan, currently an officer in the Sudanese army.  The quality of the uranium was tested in Hilat Koko, the section of Khartoum where the government was partnered with Al

Qaeda in the manufacture of chemical weapons.  Al-Fadl discussed the uranium test with a member of the Sudanese government, whose brother "runs" the building where the chemical weapon manufacture was housed.

z.      Without the material support, assistance, and aid provided by Sudanese government officials acting within the scope of their agency, employment or office, Al Qaeda could not have carried out the United States embassy bombings that caused plaintiffs' injuries. Such material support, assistance, and aid fits within the definition of material support as described by 18 U.S.C. § 2339A.

aa.     The Defendants not only knew that Al Qaeda was attempting to conceal itself in the Sudan, but facilitated and furthered Al Qaeda's concealment through the activities of the Sudanese intelligence services.  The scale of support that Defendants furnished Al Qaeda was substantial.  The regime invited Al Qaeda to roost in the Sudan and knew of, at least from 1992 onward, Al Qaeda's anti-US crusade.

bb.     The then and current regime of Sudan explicitly allied itself with Al Qaeda for an illegal and unlawful purpose.  The regime conspired with Al Qaeda in the manufacture of weapons and training of terrorists, all the while knowing of Al Qaeda's anti-US crusade.  The provision of support to a terrorist organization is illegal and unlawful.  The explicit purpose of their agreement was to make each stronger.  The US Embassy bombings greatly enhanced Al Qaeda's worldwide reputation and attracted money, recruits and support from those allied against the United States.

cc.     At various times from at least 1990, IRAN has provided material support to OSAMA BIN LADEN and AL QAEDA, often through its state-sponsored terrorist organization,

Hezbollah.  That support included advice and assistance in planning attacks against American targets. Information was often shared and exchanged between AL QAEDA and IRAN.

dd.     For many years, the Department of State has included IRAN among the *"state sponsors of terrorism."* Indeed, more than once in recent years, the Department of State has described IRAN as *"the most active"* among state sponsors of terrorism. The formation of Hezbollah and its emergence as a major terrorist organization was the product of direct intervention by Iranian operatives, including the Iranian Revolutionary Guards and the Defendant, the Iranian Ministry of Information. The above referred to activities of Hezbollah were financed, technologically supported and commanded by Iranian military/intelligence operatives.

ee.     In October 2001, an OSAMA BIN LADEN operative, Ali Mohamed, confessed in Federal District Court in New York that he and senior Bin Laden operatives had met with Hezbollah security chief Imad Mughniyah who is believed to have carried out the bombings of the U.S. Embassy in Beirut and the Marine barracks in 1983.

ff.     On many occasions, Bin Laden had praised the 1983 Beirut Marine barracks bombing conducted by Hezbollah and Iranian agents.  Bin Laden sought out Hezbollah and their Iranian commanders for their tactical expertise for large scale operations.  In 1993-4, Al Qaeda operatives received specialized-explosives training in Lebanon from Hezbollah operatives.

gg.     In June 1996, Iran's Ministry of Information and Security hosted a meeting of terrorist leaders in Tehran that included Mugniyah and senior aides to OSAMA BIN LADEN. Senior aides to OSAMA BIN LADEN subsequently met with Mugniyah on several occasions.

hh.     The purpose of the meetings between Bin Laden, Al Qaeda, Hezbollah operatives, and Iranian agents was to share information on how to build a technologically advanced bomb

that could destroy a building.  Al Qaeda did not have the know-how, prior to its contacts with Hezbollah operatives and Iranian agents, to conduct the 1998 embassy bombings.

ii.      Based on evidence developed in connection with the war in Afghanistan, senior officials in the U.S. Government, including Secretary of Defense Donald Rumsfeld, believe that AL QAEDA and TALIBAN members have now taken refuge in IRAN.

121.     The officials, agents, and employees of the foreign sovereign Defendants were acting within the scope of their agency, office or employment when they provided support to the terrorists and terrorist group that destroyed the two US embassies.  They did so because, for various reasons, it was the policy of their respective governments to aid Al Qaeda.

**D.      The events leading up to the Embassy bombings:**

122.     On or about 1994, MOHAMED SADEEK ODEH moved to Mombassa, Kenya, to set up businesses with AL QAEDA money which was used to support AL QAEDA members in Kenya.  While in Kenya, ODEH was visited by MUHAMMED ATEF, the military commander of AL QAEDA.

123.     In or about 1994, WADIH EL HAGE moved to Nairobi, Kenya, and established businesses and other organizations (*e.g.*, "Help Africa People") in Kenya.  While in Kenya, WADIH EL HAGE met repeatedly with one of Al Qaeda's military commanders, the late Abu Ubaidah al Banshiri.

124.     On or about October 25, 1994, Khalid Al Fawwaz, a member of AL QAEDA, transferred the Kenyan business "Asma Limited" to the late Abu Ubaidah al Banshiri.

125.     In or about 1996, in Mombasa, Kenya, Fahid Ali Msalam, a member of AL QAEDA, displayed explosives and detonators obtained in Tanzania to MOHAMED SADEEK ODEH.

126.     Beginning in the latter part of 1993, Anas Al Liby and other members of AL QAEDA began contemplating an attack against the U.S. Embassy in Nairobi, Kenya, in retaliation for the United States' participation in Operation Restore Hope in Somalia.

127.     In or about the latter part of 1993, Anas Al Liby and others conducted a visual and photographic surveillance of the U.S. Embassy at Nairobi, Kenya.

128.     In or about 1994, Anas Al Liby, together with other members of AL QAEDA reviewed files concerning possible terrorist attacks against: (i) the U.S. Embassy at Nairobi, Kenya; (ii) the building then housing the U.S. Agency for International Development in Nairobi, Kenya; and (iii) British, French and Israeli targets in Nairobi, Kenya.

129.     In or about 1994, members of AL QAEDA also contemplated possible terrorist attacks against targets in various countries other than Kenya.

130.     In or about 1994, KHALFAN KHAMIS MOHAMED traveled to an AL QAEDA camp in Afghanistan where he received training in explosives.

131.     Beginning in or about 1996, MOHAMED RASHED DAOUD AL-'OWHALI traveled to an AL QAEDA camp in Afghanistan where he received training in explosives, hijacking, kidnapping, assassination and intelligence techniques.

132.     In or about 1996, following his training in a number of camps in Afghanistan affiliated with AL QAEDA, MOHAMED RASHED DAOUD AL-'OWHALI met with OSAMA BIN LADEN and asked him for a "mission."

133.     In late February or early March 1997, WADIH EL HAGE, met and spoke with Mustafa Mohamed Fadhil, a member of AL QAEDA, and provided him with a new policy from OSAMA BIN LADEN to militarize the East African cell of AL QAEDA.

134.    On or about June 23, 1997, WADIH EL HAGE requested that $10,000 be transferred to an account in Kenya.  On or about July 3, 1997, this money was transferred to an account in Kenya controlled by WADIH EL HAGE.

135.    In or about March or April 1998, in Dar es Salaam, Tanzania, KHALFAN KHAMIS MOHAMED met with Mustafa Mohamed Fadhil, a member of AL QAEDA, and agreed to participate in a "jihad job."

136.    In or about May 1998, Fazul Abdullah Mohamed, a member of AL QAEDA, rented a villa at 43 New Runda Estates in Nairobi, Kenya.

137.    On or about May 4, 1998, KHALFAN KHAMIS MOHAMED applied for a Tanzanian passport in the name "Zahran Nassor Maulid."

138.    In or about June 1998, MOHAMED RASHED DAOUD AL-'OWHALI, and an individual known as "Azzam" filmed a videotape to celebrate their anticipated "martyrdom" in a bombing operation to be conducted against United States interests in East Africa.

139.    On or about June 19, 1998, "Azzam," using a passport in the name of "Gihad Ali," traveled from Karachi, Pakistan, to Nairobi, Kenya.

140.    In or about June 1998, KHALFAN KHAMIS MOHAMED and Fahid Ali Msalam, purchased a white Suzuki Samurai ('the Suzuki Samurai") at a location in Dar es Salaam, Tanzania.

141.    In or about June 1998, KHALFAN KHAMIS MOHAMED and Fahid Ali Msalam, rented house number 213 in the Ilala District of Dar es Salaam, Tanzania.

142.    In or about late June or early July 1998, Fahid Ali Msalam and Sheikh Ahmed Salim Swedan, a member of AL QAEDA, purchased a Toyota Dyna truck ("the Nairobi Bomb Truck") in Mombasa, Kenya, and made alterations to the back of the truck.

143.     In or about July 1998, Ahmed Khalfan Ghailani, a member of AL QAEDA, and Sheikh Ahmed Salim Swedan purchased a 1987 Nissan Atlas truck ("the Dar es Salaam bomb truck") in Dar es Salaam, Tanzania.

144.     In or about July 1998, Sheikh Ahmed Salim Swedan arranged for mechanical and welding work to be done on the Dar es Salaam bomb truck at various locations in Dar es Salaam, Tanzania.

145.     In or about July 1998, Sheikh Ahmed Salim Swedan purchased two large truck batteries from a location in Dar es Salaam, Tanzania.

146.     In or about July 1998, Ahmed Khalfan Ghailani and Fahid Ali Msalam purchased oxygen and acetylene tanks in Dar es Salaam, Tanzania.

147.     On or about July 31, 1998, MOHAMED RASHED DAOUD AL-'OWHALI, using a passport in the alias "Khaled Salem Saleh Bin Rashed," traveled from Karachi, Pakistan, to Nairobi, Kenya, arriving on August 2, 1998.

148.     In or about late July 1998, in Dar es Salaam, Tanzania, KHALFAN KHAMIS MOHAMED, Mustafa Mohamed Fadhil, and others, participated in the grinding of TNT.

149.     During the last week of July and the first week of August 1998, Mustafa Mohamed Fadhil, KHALFAN KHAMIS MOHAMED, and Fahid Ali Msalam met at the residence located at house 213 in the Ilala District of Dar es Salaam, Tanzania, to make final preparations for the bombing of the U.S. Embassy in Dar es Salaam, Tanzania.

150.     In or about late July or early August 1998, Mustafa Mohamed Fahil, KHALFAN KHAMIS MOHAMED, Fahid Ali Msalam, and Ahmed Khalfan Ghailani loaded boxes of TNT, gas cylinder tanks, batteries, detonators, fertilizer, and sand bags into the back of the Dar es Salaam bomb truck.

151.   On or about August 1, 1998, Abdullah Ahmed Abdullah, a member of AL QAEDA, advised MOHAMED SADEEK ODEH that all members of AL QAEDA had to leave Kenya by Thursday, August 6, 1998.

152.   In or about early August 1998, Abdullah Ahmed Abdullah and MOHAMED SADEEK ODEH traveled from Mombasa, Kenya, to Nairobi, Kenya.

153.   During the first week of August 1998, Abdullah Ahmed Abdullah, Fazul Abdullah Mohammed and MOHAMED RASHED DAOUD AL-'OWHALI, together with "Azzam" and other members of AL QAEDA, met at the villa located at number 43 New Runda Estates in Nairobi, Kenya, to make final preparations for the bombing of the U.S. Embassy at Nairobi, Kenya.

154.   On or about August 1, 1998, Ahmed Khalfan Ghailani checked into the Hilltop Hotel in Narobi, Kenya.  On or about August 2, 1998, MOHAMMED SADEEK ODEH and Fazul Abdullah Mohammed, together with other members of AL QAEDA, met at the Hilltop Hotel in Nairobi, Kenya.

155.   On or about August 2, 1998, Sheikh Ahmed Salim Swedan and Mustafa Mohamed Fadhil left Nairobi, Kenya, for Karachi, Pakistan.

156.   On or about August 3, 1998, Fahid Ali Msalam purchased air travel tickets to Pakistan for himself and MOHAMED SADEEK ODEH.

157.   On or about August 4, 1998, Abdullah Ahmed Abdullah, Fazul Abdullah Mohammed and MOHAMED RASHED DAOUD AL-'OWHALI, together with "Azzam" and other members of AL QAEDA, reconnoitered the U.S. Embassy in Nairobi, Kenya.

158.   On or about August 6, 1998, Abdullah Ahmed Abdullah and Ahmed Khalfan Ghailani left Nairobi, Kenya, for Karachi, Pakistan.

159.    On or about August 6, 1998, MOHAMED SADEEK ODEH and Fahid Ali Msalam left Nairobi, Kenya, for Karachi, Pakistan.

**E.    The bombing at the U.S. Embassy in Nairobi, Kenya:**

160.    On August 7, 1998, at approximately 9:30 a.m. local time, Fazul Abdullah Mohammed drove a pick-up truck from the villa located at 43 New Runda Estates to the vicinity of the U.S. Embassy in Nairobi, Kenya.  Meanwhile, MOHAMED RASHED DAOUD AL-'OWHALI rode in the Nairobi Bomb Truck driven by "Azzam" (a Saudi national) containing a large bomb to the U.S. Embassy in Nairobi, Kenya.  MOHAMED RASHED DAOUD AL-'OWHALI possessed four stun-type grenades, a handgun, bullets, and keys to the padlocks on the Nairobi bomb truck.

161.    On August 7, 1998, at approximately 10:30 a.m., MOHAMED RASHED DAOUD AL-'OWHALI got out of the Nairobi bomb truck as it approached the rear of the U.S. Embassy building and threw a stun grenade in the direction of a security guard before attempting to flee.

162.    On August 7, 1998, at approximately 10:30 a.m., "Azzam" drove the Nairobi bomb truck to the rear of the U.S. Embassy building and fired a handgun at the windows of the Embassy building.

163.    On August 7, 1998, at approximately 10:30 a.m., "Azzam" detonated the explosive device contained in the Nairobi bomb truck at a location near the rear of the Embassy building, demolishing a multi-story secretarial college and severely damaging the U.S. Embassy building and the Cooperative Bank Building, causing a total of more than 213 deaths, as well as injuries to more than 4,500 people, including Plaintiffs.

**F.    The bombing at the U.S. Embassy in Dar es Salaam, Tanzania:**

164.    In or about March 1998, al Qaeda operatives Khalfan Khamis Mohamed ("Khalfan") and Mustafa Mohamed Fadhil ("Fadhil") met in Dar Es Salaam, Tanzania and agreed to participate in a "jihad job".

165.    On or about May 4, 1998, Khalfan applied for a Tanzanian passport in the name of Zahran Nassor Maulid.

166.    In June 1998, Khalfan and Fahid Mohammed Ally Msalam ("Msalam") purchased a white Suzuki Samurai at a location in Dar es Salaam and rented a house in the Ilala District of Dar es Salaam, Tanzania.

167.    Throughout the summer of 1998, Fadhil, Khalafan, Msalam and Ahmed Khalfan Ghailani ("Ghailani") met at a residence on Amani Street in Dar es Salaam to discuss the bombing of the United States Embassy in Tanzania.

168.    In or about July 1998, Ghailani and Ahmed Salim Swedan ("Swedan") purchased a 1987 Nissan Atlas truck in Dar es Salaam, Tanzania, arranged for mechanical and welding work on the truck, and purchased two large truck batteries, oxygen, and acetylene tanks.

169.    In July 1998, Mohamed Sadeek Odeh ("Odeh") was advised by Ahmed Mohamed Hamed Ali ("Ali") that Bin Laden had formed a united front against the United States with other Islamic extremist groups.

170.    Prior to August 2, 1998, Abdullah Ahmed Abdullah ("Abdullah") provided Odeh with a false passport to facilitate his travel to Afghanistan for the purpose of meeting with Bin Laden and other al Qaeda operatives.

171.    During the last week of July and first week of 1998, Fadhil, Khalfan, Msalam and another operative known as "Ahmed the German" met at a residence in the Ilala District of Dar es Salaam to make final preparations for the bombing of the United States Embassy in Tanzania.

172.    In July or August 1998, Khalfan, Msalam, Ghailani, Fadhil, and others loaded boxes of TNT, cylinder tanks, batteries, detonators, fertilizer and sand bags into the back of the 1987 Nissan Atlas Truck.

173.    On or about August 7, 1998, KHALFAN KHAMIS MOHAMED accompanied "Ahmed the German" (an Egyptian national) in the Dar es Salaam Bomb Truck during a portion of the ride to the U.S. Embassy.

174.    At approximately 10:40 a.m. on August 7, 1998, "Ahmed the German" detonated an explosive device located within the 1987 Nissan Atlas in the vicinity of the United States Embassy in Dar es Salaam, Tanzania. The explosion severely damaged the United States Embassy and resulted in the death of at least 11 persons and injured at least 85.

175.    Plaintiffs' and/or Plaintiffs' decedents' deaths and injuries were caused by a willful and deliberate act of terror by al Qaeda, acting under direct and indirect sponsorship and/or direction, and with the direct material support and resources of the Defendants.

176.    In the early hours, prior to the bombing, facsimiles were sent to London, England, claiming responsibility for the embassy bombings in the name of the "Islamic Army for the Liberation of the Holy Places", which claimed that the Dar es Salaam bombing was carried out by an Egyptian national.

177.    Khalfan, Fadhil, Msalam, Ali, Ghailani, Swedan, and Ahmed the German were members of al Qaeda and perpetrated the bombing of the United States Embassy in Dar Es Salaam, Tanzania at the direction of and/or on behalf of al Qaeda. Throughout August 7, 2008 and August 8, 2008, two al Qaeda operatives, Adel Abdel Bary ("Bary") and Ibrahim Eidarous ("Eidarous"), participated in the dissemination of claims of responsibility for the bombings of the United States Embassies in Dar es Salaam.

178.    The actions of the agents and co-conspirators of the Defendants, and those who were substantially aided and abetted by Defendants, as set forth above, inflicted mental distress upon the families of the Plaintiffs. The material support rendered to co-conspirators of the Defendants, and those who were substantially aided and abetted by Defendants, fits within the definition of material support as described by 18 U.S.C. § 2339 (A).

179.    The formation of Hezbollah and its emergence as a terrorist organization was the product of direct intervention by Iranian operatives, including the Iranian Revolutionary Guards, the Quds Force and the Iranian Ministry of Information.  Al Qaeda was financed, technologically supported and/or commanded by Iranian military and intelligence operatives, including Hezbollah.

## CAUSES OF ACTION

### COUNT I

### CLAIM OF PLAINTIFFS 1 and 5
### WRONGFUL DEATH

(Under 28 U.S.C. § 1605A(c))

180.    Plaintiffs incorporate by reference the averments in the preceding paragraphs as though fully set forth at length.

181.    CAROLINE SETLA OPTI and SALLY CECELIA MAMBLEO who died at the U.S. Embassy at Nairobi, Kenya, are survived by family members who are entitled to recover damages from all Defendants for wrongful death. These family members are entitled to damages resulting from the deaths of the Decedents caused by the actions of the Defendants.

182.    As a further result of intentional and reckless acts, omissions, and other tortious conduct of the Defendants, Plaintiffs have been caused to expend various sums to raise the estates of Decedents and have incurred other expenses for which they are entitled to recover.

## COUNT II

### CLAIM OF PLAINTIFFS 11, 17, 18, 23, 25, 29, 32, 86, 89, 92, 93 and 105
### LOSS OF CONSORTIUM

(Under 28 U.S.C. § 1605A(c), U.S. state common or statutory law, Kenyan common law and

Tanzanian common law)

183.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

184.    As a further and direct proximate result of the acts of the Defendants, the enumerated Plaintiffs, as the spouses of the decedents and/or the surviving injured Plaintiffs, were caused to sustain a loss of services, comfort, society, and attentions in the past and future and suffered a loss of consortium to the detriment of the marital relationship and have suffered damages.

## COUNT III

### CLAIM OF PLAINTIFFS 4, 12, 14, 15, 16, 19, 20, 21, 22, 24, 26, 27, 28, 30, 31, 33, 34, 35, 36 through 52, 81, 85, 87, 88, 90, 91, 92 and 93

### ASSAULT AND BATTERY

(Under 28 U.S.C. § 1605A(c), Kenyan common law, Tanzanian common law, and U.S. state

common or statutory law)

185.    On Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

186.    The actions of the defendants caused and led directly to the 1998 bombings, their bombing of the embassies intentionally and willfully put the surviving plaintiffs, and the decedents prior to their deaths, in fear for their lives and apprehension of harm and injury as a direct result of fear of imminent death or mutilation.

187.    The explosion was intended to cause harmful contact with the plaintiffs and decedents, and in fact caused such contact, at the bomb sites and put them in reasonable apprehension of imminent battery.  These injuries were caused by a willful and deliberate act of persons who had been materially assisted by Defendants for the purpose of inflicting physical injuries upon the Plaintiffs and others and by so doing to intimidate the United States, and to cause its withdrawal from the Near East and Africa.  Those persons were at all times acting with the material support of the Defendants and with the concurrence of the Defendants, the Islamic Republic of Iran, the Iranian Ministry of Information and Security, the Republic of the Sudan and the Ministry of the Interior of the Republic of the Sudan.

188.    The personal injuries and losses suffered by the surviving Plaintiffs and decedents, and the consequences resulting therefrom, were proximately caused by the intentional and reckless acts, omissions, and other tortious conduct of all Defendants as described herein.

## COUNT IV

## CLAIM OF PLAINTIFFS 1 and 5
## SURVIVAL

(Under 28 U.S.C. § 1605A(c), U.S. state common or statutory law, Kenyan statutory or common law)

189.    On Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

190.    Plaintiffs bring this action for damages suffered by the estates of CAROLINE SETLA OPTI and SALLY CECELIA MAMBLEO as a result of their deaths, including their pain and suffering, inconvenience, loss of life and life's pleasures, loss of earnings and earning capacity, and other items of damages.

191.    As a result of the Defendants' wrongful conduct, Plaintiffs suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

## COUNT V

### CLAIM OF PLAINTIFFS 1 through 105
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS OR SOLATIUM

(under 28 U.S.C. § 1605A(c), Kenyan common law, Tanzanian common law, and U.S. state common law)

192.    On Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

193.    All Defendants knew that U.S. Embassy bombings would kill or injure the innocent United States Plaintiffs and foreign Plaintiffs at their place of work, leaving family members to grieve for their losses.

194.    As a direct and intended consequence of the intentional and reckless actions of the Defendants, conduct that is intolerable in a civilized society, the Defendants, their co-conspirators and those who were substantially aided and abetted by Defendants who carried out the attacks above alleged, caused the surviving Plaintiffs, and the decedents prior to their deaths, severe mental distress, which has required continuing treatment, which will continue for the balance of the Plaintiffs' lives, and they have thereby suffered damages

195.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will forever in the future suffer severe and permanent emotional distress and anxiety, permanent psychological distress and permanent mental impairment.

196.    The conduct of all Defendants was undertaken in an intentional manner to murder or injure the Plaintiffs and to cause the contemporaneous and permanent emotional suffering of the heirs of the murdered victims.

197.    As a direct and proximate result of the deaths of the Decedents, their heirs have been deprived of loss of society, future aid, assistance, services, comfort, and financial support.

198.    As a direct and proximate result of the Defendants' cowardly, barbaric and outrageous acts of murder, the heirs of the Decedents will forever grieve their deaths.

199.    The Defendants, by engaging in this unlawful conduct, recklessly and/or intentionally inflicted severe emotional distress upon the Plaintiffs.

## COUNT VI

### CLAIM OF PLAINTIFFS 1 through 105
### AIDING AND ABETTING

(under 28 U.S.C. § 1605A(c), Kenyan common law, Tanzanian common law, and US state

common law)

200.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

201.    Defendants did knowingly and willfully provide substantial assistance to the terrorists and the terrorist organization that willfully and deliberately committed the two embassy bombings, which caused the injuries, and/or deaths of the plaintiffs.  All Defendants were aware of the goals of Al Qaeda and were aware or should have been aware that the aid and assistance furnished to Al Qaeda would aid and abet Al Qaeda's terrorist activities, including the two US embassy bombings.

202.    For the reasons stated above, and having aided and abetted a terrorist organization which willfully and deliberately committed an act of terrorism which caused the injuries and/or death of the plaintiffs, all defendants are jointly and severally liable to plaintiffs for all damages in this civil action.

## COUNT VII

## CLAIM OF PLAINTIFFS 1 through 105

## CIVIL CONSPIRACY

(under 28 U.S.C. § 1605A(c), Kenyan common law, Tanzanian common law, and US state common law)

203.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

204.    As set forth more fully above, all Defendants, known and unknown, unlawfully, willfully and knowingly combined, conspired, confederated and agreed, tacitly and/or expressly, to kill, severely injure, and/or inflict personal injuries upon the Plaintiffs and the Plaintiffs decedents.

205.    As set forth above, all Defendants conspired and agreed to provide material support and resources to AL QAEDA, and the bombers in furtherance of Al Qaeda's overall goal to kill or injure American citizens and other persons present or employed at the U.S. Embassies in Nairobi, Kenya, and in Dar es Salaam, Tanzania.

206.    The Defendants' conspiracy resulted in the August 7, 1998 Embassy attacks that killed, severely injured, and/or inflicted personal injuries upon the Plaintiffs and Plaintiffs decedents.

207.    As a result of the Defendants' conspiracy, Plaintiffs suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

## COUNT VIII

## CLAIM OF PLAINTIFFS 1 through 105

## PUNITIVE DAMAGES

(under 28 U.S.C. § 1605A(c))

208.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

209.    As set forth more fully above, all Defendants, known and unknown, unlawfully, willfully and knowingly combined, conspired, confederated and agreed, tacitly and/or expressly, to kill, severely injure, and/or inflict personal injuries upon the Plaintiffs and the Plaintiffs decedents.

210.    As set forth above, all Defendants conspired and agreed to provide material support and resources to AL QAEDA, and the bombers in furtherance of Al Qaeda's overall goal to kill or injure American citizens and other persons present or employed at the U.S. Embassies in Nairobi, Kenya, and in Dar es Salaam, Tanzania.

211.    The Defendants' conspiracy resulted in the August 7, 1998 Embassy attacks that killed, severely injured, and/or inflicted personal injuries upon the Plaintiffs and the Plaintiffs decedents.

212.    Defendants' outrageous actions can not be tolerated by a civilized society and deserves the harshest condemnation of our ordered legal system.

213.    As a result of the Defendants' conspiracy, Plaintiffs suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference.

## DAMAGES

214.    As a direct and proximate result of the intentional, willful, reckless, and careless actions of the Defendants, Plaintiffs have suffered severe and permanent personal injuries, damages, and losses, including the following:

(a)     the severe mental anguish suffered by Plaintiffs;

(b)     the severe pain and suffering suffered by Plaintiffs;

(c)     the inability of Plaintiffs to perform the usual household and personal activities that they normally would have performed through the remainder of their natural life expectancies;

(d)     loss of Plaintiffs' and Decedents' earnings and future earning potential;

(e)     loss of Plaintiffs' and Decedents' lives and life's pleasures;

(f)     costs relating to managing the estates of Decedents; and

(g)     death of the Decedents by way of murder as a result of the Defendants' conduct and that of their co-conspirators; and

(h)     Economic damages, solatium, pain and suffering, and punitive damages under 28 U.S.C. § 1605A(c).

215.    The aforementioned personal injuries, death and losses incurred by the Plaintiffs were caused by the intentional outrageous acts, recklessness, and carelessness of all Defendants, acting individually and in concert, as well as other co-conspirators not yet identified, and of their agents, servants and/or employees acting within and during the course and scope of their employment, authority, or apparent authority.

216.    These aggravating circumstances also justify the award of exemplary damages to the non-US national Plaintiffs under Kenyan law.

217.    Plaintiffs demand judgment in their favor in general damages against all Defendants, jointly, severally, and *in solido*, in an amount in excess of One Billion ($1,000,000,000) Dollars.

218.    Plaintiffs also request an award of legal interest, costs, and such other relief as this Honorable Court deems appropriate.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray that the Court grant judgment in their favor and against the Defendants, jointly, severally, and *in solido* on Counts One through Ten, and grant to Plaintiffs:

·       Compensatory and punitive damages in favor of Plaintiffs and against Defendants jointly, severally, and *in solido*, in the amounts demanded in this Complaint for Damages;

·       Prejudgment interest or other appropriate interest;

·       Costs and expenses;

·       Attorney's fees; and

·       Such other and further relief as this Honorable Court may determine to be just and appropriate under the circumstances.

Respectfully submitted, this the 17th day of July, 2012.

/s/ Steven R. Perles_____
Steven R. Perles Bar No. 326975
Edward MacAllister Bar No. 494558
PERLES LAW FIRM, PC
1146 19th Street, NW
5th Floor
Washington, DC 20036
Telephone: (202) 955-9055
Telefax: (202) 955-3806

and

/s/ John Arthur Eaves, Jr._____
John Arthur Eaves, Jr., USDC Bar #432137
Eaves Law Firm
101 North State Street
Jackson, MS 39201
Telephone: (601) 355-7961
Telecopier: (601) 355-0530

and

/s/ William Wheeler_____

William Wheeler Bar No. 10848
Jamie Franks Bar No. 100156
Wheeler & Franks
Post Office Box 681
Tupelo, MS 38802
Telephone: (662) 842-0380
Telecopier: (662) 842-7491

and

/s/ Michael J. Miller
Michael J. Miller, Esq.
Bar No. 397689
The Miller Firm LLC
108 Railroad Avenue
Orange, VA 22960
Telephone: 540-672-4224
Fax:  540-672-3055

and

/s/ Allen L. Rothenberg
Allen L. Rothenberg, Esq.
Bar No. 328088
The Law Firm of Allen L. Rothenberg
1420 Walnut Street
Philadelphia, PA 19102
Telephone: 800-624-8888

and

/s/ Gavriel  Mairone
Gavriel Malrone, Esq.
Bar No. 6181698
Mann & Mairone
980 North Michigan Ave.
Suite 1400
Chicago, IL 60611
Telephone: 212-792-4005

**ATTORNEYS FOR THE PLAINTIFFS**