**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **MONICAH OKOBA OPATI, et al.,** |
| **Plaintiffs,** |
| **v.** |
| **REPUBLIC OF SUDAN, et al.,** |
| **Defendants.** |

**Civil Action No. 12-1224 (JDB)**

## MEMORANDUM OPINION

Over fifteen years ago, on August 7, 1998, the United States embassies in Nairobi, Kenya and Dar es Salaam, Tanzania were devastated by simultaneous suicide bombings that killed hundreds of people and injured over a thousand. Plaintiffs, victims of the bombings and their families brought this civil action and several related cases under the Foreign Sovereign Immunities Act ("FSIA") against the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, the Islamic Republic of Iran, the Iranian Revolutionary Guards Corps, and the Iranian Ministry of Information and Security (collectively "defendants") for their roles in supporting, funding, and otherwise carrying out these unconscionable acts. Now before the Court is plaintiffs' motion for default judgment on liability and damages.

The 284 plaintiffs in this case are Kenyan, Tanzanian, and United States citizens injured and killed in the bombings and their immediate[1] family members.[2] This case is one of many

---

[1] A few plaintiffs are not immediate family members, but as explained below, the Court will not award damages to those plaintiffs.

[2] A small number of plaintiffs are listed both in this case and the Wamai case (No. 08-1349); this case and the Amduso case (No. 08-1361); or this case and the Onsongo case (No. 08-1380). Those cases are also pending

before this Court involving the 1998 embassy bombings; this case happens to be the latest-filed of the group. Before it was even filed, this Court held in the earlier-filed and consolidated cases that it has jurisdiction over defendants and that the foreign-national plaintiffs who worked for the U.S. government are entitled to compensation for personal injury and wrongful death under 28 U.S.C. § 1605A(c)(3). See Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 148-51 (D.D.C. 2011). The Court also held that, although those plaintiffs who are foreign-national family members of victims lack a federal cause of action, they may nonetheless pursue claims under the laws of the District of Columbia. Id. at 153-57. A final judgment on liability was entered in favor of plaintiffs. Owens, No. 01-2244, Nov. 28, 2011 Order [ECF No. 214] at 2. The Court found that the deposition testimony and other evidence presented established that the defendants were responsible for supporting, funding, and otherwise carrying out the bombings in Nairobi and Dar es Salaam. See Owens, 826 F. Supp. 2d at 135-47.

Plaintiffs then filed this action. In their complaint, plaintiffs re-allege the same basic set of facts that had been found by the Court in Owens, and they seek damages under the same causes of action. See generally 2d Am. Compl. [ECF No. 24]. Service of process was completed upon each defendant, but defendants failed to respond, and a default was entered against each defendant. See Entries of Default [ECF Nos. 41, 42]. Next, plaintiffs [43] requested that this Court take judicial notice of its findings in Owens, and moved for default judgment.

Before plaintiffs can be awarded any relief, this Court must determine whether they have established their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e); see also Roeder v. Islamic Republic of Iran, 333 F.3d 228, 232 (D.C. Cir. 2003). This "satisfactory to the court" standard is identical to the standard for entry of default judgments against the United

---

before this Court. To prevent double recoveries, those plaintiffs will be awarded damages—where appropriate—in those cases, and will not be awarded damages in this case.

States in Federal Rule of Civil Procedure 55(e). Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir. 2003). In evaluating the plaintiffs' proof, the Court may "accept as true the plaintiffs' uncontroverted evidence." Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 100 (D.D.C. 2000); Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 268 (D.D.C. 2003). And a court may "take judicial notice of related proceedings and records in cases before the same court." Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (quoting Brewer v. Islamic Republic of Iran, 664 F. Supp. 2d 43, 50-51 (D.D.C. 2009)). Here, plaintiffs rely solely on this final form of evidence in support of their default judgment motion.

A three-day hearing on liability and damages was held in Owens beginning on October 25, 2010. At that hearing, the Court received evidence in the form of live testimony, videotaped testimony, affidavits, and original documentary and videographic evidence. The Court applied the Federal Rules of Evidence. Based on that record, the Court made extensive findings of fact and conclusions of law. See Owens, 826 F. Supp. 2d at 135-157.

Under Federal Rule of Evidence 201(b), courts may take judicial notice of facts "not subject to reasonable dispute" that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). And "[a] court may take judicial notice of, and give effect to, its own records in another but interrelated proceeding . . . ." Booth v. Fletcher, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938); see also 29 Am. Jur. 2d Evidence § 151 (2010). Courts in this district have done so frequently in the FSIA context. See, e.g., Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (collecting cases). Taking judicial notice of the facts, though, does not mean automatically "accepting the truth of the earlier court's findings and conclusions." Id. at 172. Instead, courts in this district rely on the evidence presented in the earlier litigation and make their own

independent findings of fact based on that evidence—the judicial records "establishing the type and substance of evidence that was presented to earlier courts" is "'not subject to reasonable dispute.'" Id. (citing Fed. R. Evid. 201(b)). Keeping all that in mind, then, the Court takes judicial notice of the evidence presented in Owens and, based on that evidence, makes the following findings of fact.

## I.     FINDINGS OF FACT

### a.     Defendants

The government of the Islamic Republic of Iran ("Iran") has a long history of providing material aid and support to terrorist organizations including al Qaeda, which has claimed responsibility for the August 7, 1998 embassy bombings. Owens, 826 F. Supp. 2d at 128.[3] The government of Iran aided, abetted, and conspired with Hezbollah, Osama Bin Laden, and al Qaeda to launch large-scale bombing attacks against the United States via powerful suicide truck bombs. Id. During the relevant time period, the Iranian defendants, through Hezbollah, provided explosives training to Bin Laden and al Qaeda and rendered direct assistance to al Qaeda operatives. Id.

Support from Iran and Hezbollah was critical to al Qaeda's execution of the 1998 embassy bombings. Id. at 139. Before its meetings with Iranian officials and agents, al Qaeda did not possess the technical expertise required to carry out the embassy bombings. Id. In the 1990s, al Qaeda received training in Iran and Lebanon on how to destroy large buildings with sophisticated and powerful explosives. Id. The government of Iran was aware of and authorized this training and assistance. Id. Hence, for these reasons, and based on the extensive evidence

---

[3] The Court takes judicial notice only of the evidence itself, and makes its own findings of fact in this case based on that evidence. But for ease of reference, these citations are to the findings of fact in Owens, which themselves cite the evidence upon which those findings of fact are based.

presented in <u>Owens</u>, the Court finds that the Iranian defendants provided material aid and support to al Qaeda for the 1998 embassy bombings and are liable for plaintiffs' damages.

The Sudanese defendants ("Sudan") gave material aid and support to Bin Laden and al Qaeda in several ways. <u>Id.</u> Sudan harbored and provided sanctuary and support to terrorists and their operational and logistical supply network. <u>Id.</u> Bin Laden and al Qaeda received the protection of the Sudanese intelligence and military from foreign intelligence services and rival militants. <u>Id.</u> Sudanese government support for Bin Laden and al Qaeda was also important to the execution of the 1998 embassy bombings. <u>Id.</u> Critically, Sudan provided safe haven in a country near the two U.S. embassies. <u>Id.</u> Sudan provided Bin Laden and al Qaeda hundreds of Sudanese passports. <u>Id.</u> The Sudanese intelligence service allowed al Qaeda to travel over the Sudan–Kenya border without restriction, permitting the passage of weapons and money to supply the Nairobi terrorist cell. <u>Id.</u> And Sudan's support of al Qaeda was official Sudanese government policy. <u>Id.</u> Hence, the Court finds that the Sudanese defendants provided material aid and support to al Qaeda for the 1998 embassy bombings and are liable for plaintiffs' damages.

With the support of Sudan and Iran, al Qaeda killed hundreds and attempted to kill thousands of individuals on site in the 1998 U.S. embassy attacks in Nairobi, Kenya and Dar es Salaam, Tanzania. <u>Id.</u> at 146. The evidence presented in <u>Owens</u>, and relied on here, overwhelmingly supports the conclusion that al Qaeda carried out the two bombing attacks, and Bin Laden himself claimed responsibility for them during an al Qaeda documentary history released by the al Qaeda media wing. <u>Id.</u>

b.      **Plaintiffs**

The Court referred plaintiffs' claims to several special masters[4] to prepare proposed findings and recommendations for a determination of damages. See Wamai, No. 08-1349, Feb. 27, 2012 Order Appointing Special Masters [ECF No. 53] at 2. The special masters have now filed completed reports on each plaintiff; those reports were filed in the Wamai, Amduso, and Onsongo cases, but the Court incorporates them by reference here. See, e.g., Wamai, No. 08-1349, Special Master Reports [ECF Nos. 63-241]. Each reference in this opinion to a special master report cites the corresponding ECF number in the Wamai case. In completing those reports and in finding facts, the special masters relied on sworn testimony, expert reports, medical records, and other evidence. The reports extensively describe the key facts relevant to each of the plaintiffs and carefully analyze their claims under the framework established in mass tort terrorism cases. The Court commends each of the special masters for their excellent work and thorough analysis.

The Court hereby adopts all facts found by the special masters relating to all plaintiffs in this case, including findings regarding the plaintiffs' employment status or their familial relationships necessary to support standing under section 1605A(a)(2)(A)(ii). See Owens, 826 F. Supp. 2d at 149. The Court also adopts all damages recommendations in the reports, with the few adjustments described below. "Where recommendations deviate from the Court's damages framework, 'those amounts shall be altered so as to conform with the respective award amounts set forth' in the framework, unless otherwise noted." Valore, 700 F. Supp. 2d at 82-83 (quoting Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 53 (D.D.C. 2007) ("Peterson II"),

---

[4] Those special masters (collectively, "the special masters") are Kenneth L. Adams, John D. Aldock, Oliver Diaz, Jr., Deborah E. Greenspan, Brad Pigott, Stephen A. Saltzburg, and C. Jackson Williams.

abrogation on other grounds recognized in Mohammadi v. Islamic Republic of Iran, 947 F. Supp. 2d 48, 65 (D.D.C. 2013)).

## II.      CONCLUSIONS OF LAW

The Court holds that it has jurisdiction over defendants and that the foreign-national plaintiffs who worked for the U.S. government are entitled to compensation for personal injury and wrongful death under 28 U.S.C. § 1605A(c)(3), for the reasons discussed at length in Owens, 826 F. Supp. 2d 128, 148-51. The Court also holds that, although those plaintiffs who are foreign-national family members of victims lack a federal cause of action, they may nonetheless pursue claims under the laws of the District of Columbia. See id. at 153-57. The Court thus will grant summary judgment on liability against defendants in this case. The U.S. citizens and foreign-national U.S.-government-employee victims have a federal cause of action, while their foreign-national family members have a cause of action under D.C. law.

### a.      The U.S. Citizens And U.S. Government-Employee Plaintiffs Are Entitled To Damages On Their Federal Law Claims Under 28 U.S.C. § 1605A

"To obtain damages in a Foreign Sovereign Immunities Act (FSIA) action, the plaintiff must prove that the consequences of the defendants' conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with application of the American rule on damages." Valore, 700 F. Supp. 2d at 83. Plaintiffs here have proven that the consequences of defendants' conduct were reasonably certain to—and indeed intended to—cause injury to plaintiffs. See Owens, 826 F. Supp. 2d at 135-46. As discussed in Owens, because the FSIA-created cause of action "does not spell out the elements of these claims that the Court should apply," the Court "is forced . . . to apply general

principles of tort law" to determine plaintiffs' entitlement to damages on their federal claims. Id. at 157 n.3.

Survivors are entitled to recover for the pain and suffering caused by the bombings: acts of terrorism "by their very definition" amount to extreme and outrageous conduct and are thus compensable by analogy under the tort of "intentional infliction of emotional distress." Valore, 700 F. Supp. 2d at 77 (citing Restatement (Second) of Torts § 46(1) (1965)); see also Baker v. Socialist People's Libyan Arab Jamahriya, 775 F. Supp. 2d 48, 74 (D.D.C. 2011) (permitting plaintiffs injured in state-sponsored terrorist bombings to recover for personal injuries, including pain and suffering, under tort of "intentional infliction of emotional distress"); Estate of Bland v. Islamic Republic of Iran, 831 F. Supp. 2d 150, 153 (D.D.C. 2011) (same). Hence, "those who survived the attack may recover damages for their pain and suffering, . . . [and for] economic losses caused by their injuries. . . ." Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 55 (D.D.C. 2012) ("Oveissi II") (citing Valore, 700 F. Supp. 2d at 82-83); see 28 U.S.C. § 1605A(c). Accordingly, all plaintiffs who were injured in the 1998 bombings can recover for their pain and suffering as well as their economic losses, and their immediate family members— if U.S. nationals—can recover for solatium. Bland, 831 F. Supp. 2d at 153. In addition, the estates of those who were killed in the attack are entitled to recover compensatory damages for wrongful death. See, e.g., Valore, 700 F. Supp. at 82 (permitting estates to recover economic damages caused to deceased victims' estates).

### b.    Family Members Who Lack A Federal Cause Of Action Are Entitled To Damages Under D.C. Law

This Court will apply District of Columbia law to the claims of any plaintiffs for whom jurisdiction is proper, but who lack a federal cause of action under the FSIA. This category

includes only the foreign-national family members of the injured victims from the 1998 bombings. Individuals in this category seek to recover solatium damages under D.C. law based on claims of intentional infliction of emotional distress. To establish a prima facie case of intentional infliction of emotional distress under D.C. law, a plaintiff must show: (1) extreme and outrageous conduct on the part of the defendant which, (2) either intentionally or recklessly, (3) causes the plaintiff severe emotional distress. Larijani v. Georgetown Univ., 791 A.2d 41, 44 (D.C. 2002). Acts of terrorism "by their very definition" amount to extreme and outrageous conduct, Valore, 700 F. Supp. 2d at 77; the defendants in this case acted intentionally and recklessly; and their actions caused each plaintiff severe emotional distress, see Owens, 826 F. Supp. 2d at 136-45; Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 74-75 (D.D.C. 2010). Likewise, D.C. law allows spouses and next of kin to recover solatium damages. D.C. Code § 16-2701. Based on the evidence submitted to the special masters, the Court concludes that the foreign-national family members of the victims of the 1998 bombings have each made out claims for intentional infliction of emotional distress and are entitled to solatium damages (with the few exceptions detailed below). As a result, the Court will award plaintiffs a total judgment of over $3.1 billion.

## III.    DAMAGES

Having established that plaintiffs are entitled to damages, the Court now turns to the question of the amount of damages, which involves resolving common questions related to plaintiffs with similar injuries. The damages awarded to each plaintiff are laid out in the tables in the separate Order and Judgment issued on this date.

### a.      Compensatory Damages

#### 1.      Economic damages

Under the FSIA, injured victims and the estates of deceased victims may recover economic damages, which typically include lost wages, benefits and retirement pay, and other out-of-pocket expenses. 28 U.S.C. § 1605A(c). The special masters recommended that the estates of four deceased plaintiffs be awarded economic damages. To determine those plaintiffs' economic losses resulting from the bombings, the special masters relied on economic reports submitted by the Center for Forensic Economic Studies ("CFES"), which estimated lost earnings, fringe benefits, retirement income, and the value of household services lost as a result of the injuries sustained from the bombing. In turn, CFES relied on information from the survivors as well as other documentation, including country-specific economic data and employment records. See, e.g., Report of Special Master Jackson Williams Concerning Hesbon Bulimu [ECF No. 235] at 10-17 (further explaining methodology employed in creating the economic loss reports). The Court adopts the findings and recommendations of the special masters as to economic losses to be awarded to the estates of deceased victims.

#### 2.      Awards for pain and suffering due to injury

Courts determine pain-and-suffering awards for survivors based on factors including "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." See O'Brien v. Islamic Republic of Iran, 853 F. Supp. 2d 44, 46 (D.D.C. 2012) (internal quotation marks omitted). When calculating damages amounts, "the Court must take pains to ensure that individuals with similar injuries receive similar awards." Peterson II, 515 F. Supp. 2d at 54. Recognizing this need for uniformity, courts in this district have developed a general framework

for assessing pain-and-suffering damages for victims of terrorist attacks, awarding a baseline of $5 million to individuals who suffer severe physical injuries, such as compound fractures, serious flesh wounds, and scars from shrapnel, as well as lasting and severe psychological pain. See Valore, 700 F. Supp. 2d at 84. Where physical and psychological pain is more severe—such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead—courts have departed upward from this baseline to $7 million and above. See O'Brien, 853 F. Supp. 2d at 47. Similarly, downward departures to a range of $1.5 to $3 million are warranted where the victim suffers severe emotional injury accompanied by relatively minor physical injuries. See Valore, 700 F. Supp. 2d at 84-85. Damages for extreme pain and suffering are warranted for those individuals who initially survive the attack but then succumb to their injuries, but to the estates of those who are killed instantly, courts award no pain-and-suffering damages. See Haim v. Islamic Republic of Iran, 425 F. Supp. 2d 56, 71 (D.D.C. 2006); see also Peterson II, 515 F. Supp. 2d at 53-55.

The need to maintain uniformity with awards to plaintiffs in prior cases and between plaintiffs in this case is particularly evident. A great number of plaintiffs were injured in the bombings. Those injuries, and evidence of those injuries, span a broad range. Although the special masters ostensibly applied the same guidelines, their interpretations of those guidelines understandably brought about recommendations of different awards even for plaintiffs who suffered very similar injuries—particularly those plaintiffs who did not suffer severe physical injuries. For those plaintiffs, the Valore court explained that downward departures to a range of $1.5 million to $3 million are appropriate, and the Court will apply that guideline as described at length in this Court's opinion in Wamai v. Republic of Sudan, No. 08-1349 (D.D.C. July 25,

2014). Those who suffered from injuries similar to plaintiffs who are generally awarded the "baseline" award of $5 million (involving some mix of serious hearing or vision impairment, many broken bones, severe shrapnel wounds or burns, lengthy hospital stays, serious spinal or head trauma, and permanent injuries) will be awarded that baseline. See Valore, 700 F. Supp. 2d at 84.

And for two plaintiffs, who suffered even more grievous wounds, upward departures to $7.5 million are in order.

Jael Oyoo was injured in the blast at the United States Embassy in Nairobi. See Report of Special Master Stephen Saltzburg Concerning Jael Oyoo [ECF No. 97] at 2-3. When she was pulled out of the rubble by rescuers, the burns to her face and head were so severe that rescuers thought she was dead. Id. at 3. She suffered total vision loss in her left eye and severely impaired vision in her right eye. Id. She continues to suffer from shrapnel embedded in her skin and eyes. Id. She has never regained the full use of her right hand. Id. And she spent two years recovering in hospitals. Id.

William Maina was working off-site during the blast at the United States Embassy in Nairobi, but after hearing of the attack, he rushed to the site of the bombing to help with recovery efforts. Report of Special Master Jackson Williams Concerning William Maina [ECF No. 233] at 3. While digging through the rubble, he suffered cuts and scratches, and was exposed to victims' blood. Id. Afterwards, he was diagnosed with HIV, which is a bloodborne pathogen and an occupational risk for first responders. Id.; see Ctrs. for Disease Control & Prev., First Responders: Encourage Your Workers to Report Bloodborne Pathogen Exposures (July 2008).[5] In 1998, approximately 12% of adults between the ages of 15 and 49 in urban Kenya were HIV-

---

[5] Available at http://www.cdc.gov/niosh/docs/2008-118/default.html.

positive. Nat'l Aids Control Council, <u>United Nations General Assembly Special Session on HIV/AIDS: Country Report – Kenya</u>, at 5 Fig.1, (Jan. 2006).[6] It seems reasonable to infer that a foreseeable risk of bombing an embassy is that first responders might contract bloodborne diseases, such as HIV, during recovery efforts, particularly in a country like Kenya with relatively high incidence rates. The victim here also provided evidence suggesting that he did not contract the disease elsewhere. Maina testified that he did not have HIV before the bombing, that he does not use intravenous drugs, that he has not engaged in unprotected sexual intercourse, that he has not had contact with prostitutes, and that he has never had a blood transfusion. Report of Special Master Jackson Williams Concerning William Maina at 6. Considering the circumstances and the evidence presented, Maina has shown "some reasonable connection between the act or omission of the defendant and the damages which [he] has suffered." <u>Valore</u>, 700 F. Supp. 2d at 66 (citation omitted). Although he otherwise suffered only minor physical injuries during the recovery efforts, HIV is a chronic, serious, and stigmatizing disease requiring a lifetime of treatment. Oyoo's and Maina's injuries are comparable to those plaintiffs awarded $7–$8 million in <u>Peterson II</u>, and the Court will award them $7.5 million for pain and suffering. <u>See</u> 515 F. Supp. 2d at 55-57.

The Court adopts the recommendations by special masters of awards consistent with these adjusted guidelines, and will adjust inconsistent awards accordingly.

3.     <u>Solatium</u>

"In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium." <u>Acosta v. Islamic Republic of Iran</u>, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). Only

---

[6] <u>Available at</u> http://data.unaids.org/pub/Report/2006/2006_country_progress_report_kenya_en.pdf.

immediate family members—parents, siblings, spouses,[7] and children—are entitled to solatium awards. See Valore, 700 F. Supp. 2d at 79. The commonly accepted framework for solatium damages in this district is that used in Peterson II, 515 F. Supp. 2d at 52. See Valore, 700 F. Supp. 2d at 85; Belkin, 667 F. Supp. 2d at 23. According to Peterson II, the appropriate amount of damages for family members of deceased victims is as follows: $8 million to spouses of deceased victims, $5 million to parents of deceased victims, and $2.5 million to siblings of deceased victims. 515 F. Supp. 2d at 52. The appropriate amount of damages for family members of injured victims is as follows: $4 million to spouses of injured victims, $2.5 million to parents of injured victims, and $1.25 million to siblings of injured victims. Id. Courts in this district have differed somewhat on the proper amount awarded to children of victims. Compare Peterson II, 515 F. Supp. 2d at 51 ($2.5 million to child of injured victim), with Davis v. Islamic Republic of Iran, 882 F. Supp. 2d 7, 14 (D.D.C. 2012) ($1.5 million to child of injured victim). The Court finds the Peterson II approach to be more appropriate: to the extent such suffering can be quantified, children who lose parents are likely to suffer as much as parents who lose children. Children of injured victims will thus be awarded $2.5 million and, consistent with the Peterson II approach of doubling solatium awards for relatives of deceased victims, children of deceased victims will be awarded $5 million.

Although these amounts are guidelines, not rules, see Valore, 700 F. Supp. 2d at 86, the Court finds the distinctions made by the Valore court to be responsible and reasonable, and hence it will adopt the same guidelines for determining solatium damages here. In the interests of fairness and to account for the difficulty in assessing the relative severity of each family

---

[7] The Court adopts Special Master Brad Pigott's recommendation that the common-law wife of Zephania Mboge, Salima Rajabu, be awarded solatium damages, for the reasons discussed in the special master report, although the Court will adjust that award to be consistent with the guidelines discussed in this opinion. See Report of Special Master Brad Pigott Concerning Zephania Mboge [ECF No. 161] at 5-6.

member's suffering, in this case and in related cases, the Court will depart from those guidelines only for a few plaintiffs for whom the special master's report is particularly convincing.

In some instances, special masters recommended that spouses of deceased victims receive $10 million. See, e.g., Report Concerning Hesbon Bulimu at 3. Because the Court adopts the Peterson II guidelines, each of these recommendations will be adjusted and those plaintiffs will be awarded $8 million. See 515 F. Supp. 2d at 52. Similarly, in some instances, special masters recommended that spouses and children of injured victims receive $5 million and $3 million, respectively. See, e.g., Report of Special Master Kenneth Adams Concerning Livingstone Busera Madahana [ECF No. 175] at 5-8. The Court will decrease those awards to $4 million and $2.5 million, respectively. See 515 F. Supp. 2d at 52.

The special masters also recommended against awarding solatium damages to some injured victims' children who were born after the bombings occurred. While the Court acknowledges that the bombings' terrible impact on the victims and their families continues to this day, in similar cases courts have found that children born following terrorist attacks are not entitled to damages under the FSIA. See Davis, 882 F. Supp. 2d at 15; Wultz v. Islamic Republic of Iran, 864 F. Supp. 2d 24, 36 (D.D.C. 2012). In holding that a plaintiff must have been alive at the time of an attack to recover solatium damages, the Davis court recognized the need to draw lines in order to avoid creating "an expansive and indefinite scope of liability" under the FSIA— for example, liability to children born fifteen years after an attack (a real possibility in this drawn-out litigation). 882 F. Supp. 2d at 15. The Court agrees with the special masters and with the Davis court's interpretation of the FSIA, and holds that those plaintiffs not alive at the time of the bombings cannot recover solatium damages. Hence, the Court adopts the special masters' recommendations and dismisses the claims of Jackline Wambui, James Gwaro, Onael David

Mdobilu, Joshua Daniel Mdobilu, and Mercy Bulimu because they were all born after the bombings. See Report of Special Master John Aldock Concerning Simon Ngure [ECF No. 120] at 7-8; Report of Special Master John Aldock Concerning Julius Ogoro [ECF No. 134] at 8; Report of Special Master Jackson Williams Concerning Justina Mdobilu [ECF No. 221] at 10-11; Report Concerning Hesbon Bulimu at 8.

For a few plaintiffs in this case, the special masters recommended that no solatium damages be awarded because the record does not contain sufficient evidence to support their claims. See Peterson II, 515 F. Supp. 2d at 46. The Court adopts each of those recommendations, and also finds that in some instances the special masters recommended awarding solatium damages to plaintiffs despite insufficient evidence or evidence directly disclaiming any emotional harm. So in addition to the plaintiffs for whom the special masters recommend no solatium awards, Asha Abdullah, Said Katimba, Valentina Hiza, Christopher Hiza, Christianson Hiza, Christemary Hiza, Sally Omondi, and Miriam Muthoni  will not be awarded damages. See Report of Special Master Stephen Saltzburg Concerning Katimba Mohamed Selemani [ECF No. 100] at 4 (finding that "[t]here is little in the evidence before me about" Asha Abdullah and noting "absence of specific evidence"); Report of Special Master Jackson Williams Concerning Victor Mpoto [ECF No. 136] at 6 (noting that Denis Mpoto was very young at the time of the bombings and that he "did not feel personally impacted by his father's injuries"); Report of Special Master Brad Pigott Concerning Christant Hiza [ECF No. 157] at 6-9 (Valentina Hiza "denied . . . that she has herself suffered long-term emotional damage from the bombing"; Christopher Hiza, Christianson Hiza, and Christemary Hiza each denying that they suffered continuing emotional damages from the bombing).

The Court finds that the special masters have appropriately applied the solatium damages framework to most of the plaintiffs in this case, and will adopt their recommendations with a few exceptions. Other courts in this district have held that it is inappropriate for the solatium awards of family members to exceed the pain-and-suffering awards of surviving victims. See Davis, 882 F. Supp. 2d at 15; O'Brien, 853 F. Supp. 2d at 47; Bland, 831 F. Supp. 2d at 157. The Court will follow that approach here.[8] The special masters recommended solatium awards exceeding the pain-and-suffering awards to the related victim in several cases, albeit sometimes inadvertently, because of this Court's adjustment of pain-and-suffering awards. Hence, the Court will reduce those solatium awards to match corresponding pain-and-suffering awards where appropriate.

**b.      Punitive Damages**

Plaintiffs request punitive damages under section 1605A(c). Punitive damages "serve to punish and deter the actions for which they are awarded." Valore, 700 F. Supp. 2d at 87. Courts calculate the proper amount of punitive damages by considering four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." Oveissi II, 879 F. Supp. 2d at 56 (quoting Acosta, 574 F. Supp. 2d at 30). In this case, the first three factors weigh heavily in favor of an award of punitive damages: the character of defendants' actions and the nature and extent of harm to plaintiffs can accurately be described as horrific. Scores were murdered, hundreds of families were torn asunder, and thousands of lives were irreparably damaged. The need for deterrence here is tremendous. And although specific

---

[8] Some special masters recommended proportionally reducing solatium awards to reflect downward departures from the "standard" $5 million pain-and-suffering amount. See, e.g., Report of Special Master Jackson Williams Concerning Justina Mdobilu [ECF No. 221] at 8-11. For consistency, and because other courts in this district usually reduce solatium awards only to match injured victims' pain-and-suffering awards, the Court will not proportionally reduce solatium awards. Instead, the Court will reduce solatium awards to match pain-and-suffering awards.

evidence in the record on defendants' wealth is scant, they are foreign states with substantial wealth.

Previous courts in this district, confronted with similar facts, have calculated punitive damages in different ways. See, e.g., Baker, 775 F. Supp. 2d at 85 (surveying cases). One attractive method often used in FSIA cases is to multiply defendants' annual expenditures on terrorist activities by a factor of three to five. See, e.g., Valore, 700 F. Supp. 2d at 88-90. Unfortunately, there is not enough evidence in the record on defendants' expenditures during the relevant time period to adopt that approach here. Other courts have simply awarded families of terrorism victims $150 million in punitive damages. See, e.g., Gates v. Syrian Arab Republic, 580 F. Supp. 2d 53, 75 (D.D.C. 2008), aff'd, 646 F.3d 1 (D.C. Cir. 2011). Using that approach here would result in a colossal figure, given the number of families involved.

This case, when combined with the related cases involving the same bombings where plaintiffs seek punitive damages,[9] involves over 600 plaintiffs. Valore was a similar case, involving another terrorist bombing sponsored by Iran: the bombing of the United States Marine barracks in Beirut, Lebanon. Two hundred and forty-one military servicemen were murdered in that bombing. A similar number of people, 224, died here, and hundreds more were injured. In Valore, then-Chief Judge Lamberth used the expenditures-times-multiplier method. All told, Judge Lamberth awarded approximately $4 billion in compensatory damages in cases involving the Beirut bombing and about $5 billion in punitive damages. Estate of Brown v. Islamic Republic of Iran, 872 F. Supp. 2d 37, 45 n.1 (D.D.C. 2012) (tallying awards). This case is quite similar in magnitude: all told, including the judgments issued in Owens, Mwila, and Khaliq, and

---

[9] Plaintiffs in Owens, Mwila, and Khaliq, cases (involving the same bombings) in which this Court previously awarded damages, did not seek punitive damages. See, e.g., Khaliq v. Republic of Sudan, No. 10-356, 2014 WL 1284973, at *3 (D.D.C. Mar. 28, 2014).

the judgments to be issued in conjunction with this opinion and in <u>Wamai</u>, <u>Amduso</u>, and <u>Onsongo</u>, the Court will have issued just over $5 billion in compensatory damages. Given that similarity, the inability of this Court to employ the expenditure-times-multiplier method, and in light of the "societal interests in punishment and deterrence that warrant imposition of punitive sanctions" in cases like this, the Court finds it appropriate to award punitive damages in an amount equal to the total compensatory damages awarded in this case. <u>Beer v. Islamic Republic of Iran</u>, 789 F. Supp. 2d 14, 17 (D.D.C. 2011) (citing <u>Flatow v. Islamic Republic of Iran</u>, 999 F. Supp. 2d 1 (D.D.C. 1998)). Doing so will result in a punitive damage award consistent with the punitive damage awards in analogous cases, particularly those involving the Beirut bombing, and will hopefully deter defendants from continuing to sponsor terrorist activities. The Court will apportion punitive damages among plaintiffs according to their compensatory damages. <u>See</u> <u>Valore</u>, 700 F. Supp. 2d at 90.

      **c.**      **Prejudgment Interest**

An award of prejudgment interest at the prime rate is appropriate in this case. <u>See</u> <u>Oldham v. Korean Air Lines Co.</u>, 127 F.3d 43, 54 (D.C. Cir. 1997); <u>Forman v. Korean Air Lines Co.</u>, 84 F.3d 446, 450-51 (D.C. Cir. 1996). Prejudgment interest is appropriate on the whole award, including pain and suffering and solatium—although not including the punitive damage award, as that is calculated here by reference to the entire compensatory award—with one exception. <u>See</u> <u>Reed v. Islamic Republic of Iran</u>, 845 F. Supp. 2d 204, 214-15 (D.D.C. 2012) (awarding prejudgment interest on the full award). <u>But see</u> <u>Oveissi v. Islamic Republic of Iran</u>, 768 F. Supp. 2d 16, 30 n.12 (D.D.C. 2011) (declining to award prejudgment interest on solatium damages). Because some of the economic loss figures recommended by the special masters have already been adjusted to reflect present discounted value, <u>see</u> <u>District of Columbia v. Barritaeu</u>,

399 A.2d 563, 568-69 (D.C. 1979), the Court will not apply the prejudgment interest multiplier to the economic loss amounts except those calculated in 1998 dollars. See Doe, 943 F. Supp. 2d at 186 (citing Oldham, 127 F.3d at 54); Report Concerning Hesbon Bulimu at 11-18 (explaining how to properly apply interest here without double-counting). Awards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks. Because plaintiffs were unable to bring their claims immediately after the attacks, they lost use of the money to which they were entitled upon incurring their injuries. Denying prejudgment interest on these damages would allow defendants to profit from the use of the money over the last fifteen years. Awarding prejudgment interest, on the other hand, reimburses plaintiffs for the time value of money, treating the awards as if they were awarded promptly and invested by plaintiffs.

The Court will calculate the applicable interest using the prime rate for each year. The D.C. Circuit has explained that the prime rate—the rate banks charge for short-term unsecured loans to creditworthy customers—is the most appropriate measure of prejudgment interest, one "more appropriate" than more conservative measures such as the Treasury Bill rate, which represents the return on a risk-free loan. See Forman, 84 F.3d at 450. Although the prime rate, applied over a period of several years, can be measured in different ways, the D.C. Circuit has approved an award of prejudgment interest "at the prime rate for each year between the accident and the entry of judgment." See id. Using the prime rate for each year is more precise than, for example, using the average rate over the entire period. See Doe, 943 F. Supp. 2d at 185 (noting that this method is a "substantially more accurate 'market-based estimate'" of the time value of money (citing Forman, 84 F. 3d at 451)). Moreover, calculating interest based on the prime rate

for each year is a simple matter.[10] Using the prime rate for each year results in a multiplier of 2.26185 for damages incurred in 1998.[11] Accordingly, the Court will use this multiplier to calculate the total award.[12]

## **CONCLUSION**

The 1998 embassy bombings shattered the lives of all plaintiffs in this case. Reviewing their personal stories reveals that, even more than fifteen years later, they each still feel the horrific effects of that awful day. Damages awards cannot fully compensate people whose lives have been torn apart; instead, they offer only a helping hand. But that is the very least that these plaintiffs are owed. Hence, it is what this Court will facilitate.

A separate Order consistent with these findings has issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: July 25, 2014

---

[10] To calculate the multiplier, the Court multiplied $1.00 by the prime rate in 1999 (8%) and added that amount to $1.00, yielding $1.08. Then, the Court took that amount and multiplied it by the prime rate in 2000 (9.23%) and added that amount to $1.08, yielding $1.17968. Continuing this iterative process through 2014 yields a multiplier of 2.26185.

[11] The Court calculated the multiplier using the Federal Reserve's data for the average annual prime rate in each year between 1998 and 2014. See Bd. of Governors of the Fed. Reserve Sys. Historical Data, available at http://www.federalreserve.gov/releases/h15/data.htm (last visited July 25, 2014). As of the date of this opinion, the Federal Reserve has not posted the annual prime rate for 2014, so the Court will conservatively estimate that rate to be 3.25%, the rate for the previous six years.

[12] The product of the multiplier and the base damages amount includes both the prejudgment interest and the base damages amount; in other words, applying the multiplier calculates not the prejudgment interest but the base damages amount plus the prejudgment interest, or the total compensatory damages award.